961 P.2d 1181

John DOE, Plaintiff–Appellant,

v.

Fred GARCIA, Defendant,

and

Sisters of the Holy Cross, d/b/a St. Alphonsus Regional Medical Center, Defendants–Respondents.

No. 23608.

Supreme Court of Idaho, Boise, December 1997 Term.

March 20, 1998.

Rehearing Denied July 8, 1998.

Holden, Kidwell, Hahn & Crapo, Idaho Falls, for appellant. Shan Butcher Perry argued.

Cantrill, Skinner, Sullivan & King, Boise, for respondents. Tyra H. Stubbs argued.

JOHNSON, Justice.

This is a negligent hiring and supervision case. We conclude that there are genuine issues of material fact that preclude summary judgment.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

Fred Garcia (Garcia) became employed by Sisters of the Holy Cross dba St. Alphonsus Regional Medical Center (the hospital) as a respiratory therapist in September 1987. During the hiring process, the hospital reviewed an application completed by Garcia, contacted one of Garcia's past employers, and conducted a half hour personal interview. This process revealed nothing out of the ordinary and Garcia was hired. Shortly after Garcia began his employment at the hospital, he was reprimanded for encouraging underage employees to consume alcohol. Also in the fall of 1987, Garcia sought the services of the Employee Assistance Program (EAP) for what he termed "being quite preoccupied with sex." The staff of EAP was directly employed by the hospital. During one of the counseling sessions Garcia had with EAP, he admitted to a counselor (the EAP counselor) that he had been terminated from St. Mary's Regional Medical Center

(St.Mary's) in Reno, Nevada, for sexually molesting a patient in December 1985. Neither the EAP counselor nor her supervisor, whom she told of Garcia's admission, advised any other employees of the hospital about Garcia's prior sexual conduct with a patient.

John Doe (Doe), a minor, was a patient in the hospital for a period of six weeks beginning on August 1, 1988. During his hospitalization, Doe received respiratory therapy from Garcia and formed a personal relationship. Following Doe's release from the hospital, Garcia continued to develop his relationship with Doe. Garcia was discharged by the hospital in June 1989 for encouraging underage employees to consume alcohol after being warned not to do so. During the summer of 1989 after Garcia left the hospital, Garcia began sexually molesting Doe.

Doe filed suit against Garcia, Garcia's wife, and the hospital. The hospital requested that the trial court grant summary judgment dismissing Doe's negligence action. For purposes of this request, the hospital asked the trial court to assume that it was negligent in hiring and supervising Garcia. At the same time, Doe requested further discovery concerning the issues of duty, foreseeability, and breach. The trial court denied the discovery request and granted summary judgment. Doe appealed both rulings, and this Court assigned the case to the Court of Appeals. The Court of Appeals ruled that the trial court should not have denied the motion requesting further discovery, which necessarily required the vacating of the grant of summary judgment. *Doe v. Sisters of the Holy Cross*, 126 Idaho 1036, 1044, 895 P.2d 1229, 1237 (Ct.App.1995) (*Doe I*). The Court of Appeals remanded the case to the trial court to permit further discovery "regarding the hospital's knowledge of Garcia's psychiatric history and sexual proclivities...." *Id.*

Following the completion of all discovery in the case, the hospital again requested summary judgment. This time the hospital did not ask the trial court to assume it was negligent in hiring and supervising Garcia. The trial court again granted summary judgment. Doe appealed.

## II.

### THERE IS A GENUINE ISSUE OF MATERIAL FACT CONCERNING THE HOSPITAL'S NEGLIGENCE IN HIRING GARCIA.

■ Doe asserts that the trial court should not have granted summary judgment dismissing his negligent hiring claim. We agree.

Before hiring Garcia, the hospital did not inquire about the circumstances of Garcia's termination at St. Mary's, the last place at which Garcia was employed as a respiratory therapist. The evidence presented in connection with the hospital's request for summary judgment indicates that the policy St. Mary's followed when it received an inquiry concerning a former employee was to release only dates of employment and positions held. St. Mary's would, however, release an employee's personnel file to the employee upon written request. Garcia's personnel file from St. Mary's contains an indication that the reason for his dismissal was sexual molestation of a patient. For purposes of summary judgment, the reasonable inferences that we must draw in favor of Doe as the nonmoving party are that if the hospital had requested that Garcia obtain his employment file from St. Mary's, Garcia would have done so and would have provided the file to the hospital for its review. This creates a genuine issue of material fact whether the hospital was negligent in hiring Doe.

## III.

### THE EAP COUNSELOR HAD A DUTY TO INFORM OTHERS AT THE HOSPITAL OF GARICIA'S SEXUAL PROPENSITIES.

■ Doe asserts that the EAP counselor had a duty to inform others at the hospital of Garcia's sexual propensities. We agree.

EAP is a mental health assistance and referral service available to all employees of the hospital. The materials the hospital distributed to its employees concerning EAP indicate the confidential and private nature of EAP services. EAP counselors are employees of the hospital. When Garcia discussed his sexual problem with the EAP counselor in the fall of 1987, he talked in terms of being "preoccupied with sex" and stated that "any partner will do."

Although the EAP was designed around confidentiality, the evidence presented in connection with the hospital's request for summary judgment indicates that the EAP counselor would reveal information gained from an employee if "someone was in danger." The EAP counselor was concerned for the welfare of patients in the hospital after learning of Garcia's sexual problems. At the time Garcia revealed his sexual propensities to the EAP counselor, no statute or common law precedent in this state made the communication privileged. Therefore, the EAP counselor had a duty to disclose the information to others at the hospital. As the employer of the EAP counselor, the hospital is responsible for the failure of the EAP counselor to do so.

## IV.

### THERE IS A GENUINE ISSUE OF MATERIAL FACT CONCERNING THE HOSPITAL'S NEGLIGENT SUPERVISION OF GARCIA.

■ Doe asserts that the trial court should not have granted summary judgment dismissing his claim for negligent supervision. We agree.

Because of the knowledge the hospital had through the EAP counselor of Garcia's sexual propensities, there is a genuine issue of material fact whether the hospital could have prevented the injuries to Doe by taking action to supervise Garcia in a manner that would have prevented Garcia from establishing a relationship with Doe during Doe's hospitalization.

## V.

### THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING THE LIABILITY OF THE HOSPITAL FOR DOE'S INJURIES.

■ Doe asserts that the trial court should not have dismissed his claim that the hospital

breached its duty toward him and that the breach was a proximate cause of his injuries. We agree.

■ This Court follows the rule that " 'one owes the duty to every person in our society to use reasonable care to avoid injury to the other person *in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury.*' " *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980) (emphasis in original). Furthermore, there is a "general rule that each person has a duty of care to prevent unreasonable, foreseeable risks of harm to others." *Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 300, 796 P.2d 506, 509 (1990). In *Rife v. Long,* 127 Idaho 841, 908 P.2d 143 (1995), the Court said:

Determining whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors which include:

[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved (citations omitted).

*Id.* at 846, 908 P.2d at 148.

■ In the context of the summary judgment granted by the trial court in the present case, the first question we must ask under *Rife* is whether there is a genuine issue of material fact concerning whether the hospital could have foreseen injury to others from Garcia. Foreseeability "includes *whatever result is likely enough* in the setting of modern life that a reasonably prudent person would take such into account in guiding reasonable conduct." *Sharp,* 118 Idaho at 301, 796 P.2d at 510 (emphasis added). The genuine issues of material fact concerning the negligent hiring of Garcia and the knowledge the hospital had through the EAP counselor

of Garcia's sexual propensities create a genuine issue of material fact concerning whether the hospital should have foreseen that Garcia would use his position with the hospital to form a relationship with a patient that would develop into sexual molestation of the patient. The hospital does not dispute that this molestation injured Doe.

Concerning the closeness of the connection between the hospital's conduct and Doe's injury, Garcia and Doe became acquainted and formed a relationship while Garcia administered respiratory therapy to Doe at the hospital. Although it was several months after the formation of this relationship that Garcia sexually molested Doe, the connection is close enough to place a duty on the hospital not to allow Garcia to form his relationship with Doe that eventually injured Doe.

Concerning moral blame, because there is a genuine issue of material fact whether the hospital could have become aware of Garcia's dangerous sexual propensities before the hospital allowed Garcia to treat Doe, there is a question about the moral blame to be placed on the hospital for its hiring and supervision practices. Concerning the social policy of preventing future harm, the same analysis indicates there is a question whether the hospital had a duty to prevent harm to Doe by Garcia.

Concerning the burden that would be placed on the hospital if a duty is imposed in this case, the genuine issues of material fact concerning the hiring of Garcia and the knowledge of the hospital through the EAP counselor indicate that there is not a heavy burden placed on the hospital in the exercise of its hiring practices and EAP disclosure procedures and policies.

Concerning insurance availability for the risk, the hospital has not presented any evidence to show that it lacks insurance coverage for the risk involved in this case.

■ We then turn to the question of proximate cause. This case presents multiple potential causes for the harm ultimately suffered by Doe: (1) the negligence, if any, of the hospital, (2) the negligence, if any, of Doe and his parents, and (3) the intentional con-

duct of Garcia. The substantial factor test is the proper proximate cause analysis when there is more than one potential cause of the injuries. *Le'Gall v. Lewis County*, 129 Idaho 182, 187, 923 P.2d 427, 432 (1996). A "substantial factor" is one that "in natural or probable sequence, produced the damage complained of" or one "concurring with some other cause acting at the same time, which in combination with it, causes the damage." *Fussell v. St. Clair*, 120 Idaho 591, 595, 818 P.2d 295, 299 (1991).

For purposes of summary judgment, there is a genuine issue of material fact concerning whether the formation of the relationship between Garcia and Doe while Garcia was an employee of the hospital and Doe was a patient, is a substantial factor in the causation of Doe's injuries.

## VI.

## CONCLUSION

We vacate the summary judgment and remand the case for further proceedings.

We award Doe costs, but not attorney fees, on appeal.

TROUT, C.J., and SILAK and WALTERS, JJ., concur.

SCHROEDER, Justice, dissenting.

I respectfully dissent from the opinion of the Court. The district court wrote a comprehensive opinion analyzing the facts and the law which this Court should follow. I adopt the reasoning and result reached by the district court and set forth the pertinent portions of the opinion of the district court as my dissent. To quote:

In 1987, Fred Garcia sought employment at St. Alphonsus Regional Medical Center as a respiration therapist, a position for which he was academically and medically qualified. He filled out a standard application form which listed his prior employment. While the hospital did not check with all of his prior employers, those who were contacted either commented that Garcia had been a satisfactory employee or made no comments. Plaintiff cannot point to any time from Garcia's references which

was revealed to the hospital or which would have been revealed had the hospital inquired, which would have indicated to the hospital that Garcia posed any risk to children or adolescent patients. Garcia was hired.

Garcia did not reveal to the hospital that he had been discharged from a hospital in Nevada for sexual improprieties with a patient, or that he had pleaded guilty to some type of sexual misconduct in a California park in 1982. However, plaintiff has failed to show how the defendant hospital could have learned of these items, even upon inquiry. The only evidence in the record is that the Nevada hospital would not have revealed the circumstances of Garcia's discharge even if asked directly. The individual who offered testimony for the Nevada hospital stated that it was their policy to divulge no information other than dates of employment when asked about prior employees. An official record of the California incident is not available at all. Even today, the only reference to the California incident comes from Garcia's own admission in the presentence investigator's material, brought to light in connection with his criminal prosecution for the misconduct of this case. Viewing the evidence most favorably toward the plaintiff, there is no proof of any information which St. Alphonsus could have reasonably obtained prior to its decision to employ Garcia which would have caused it any concern over his sexual proclivities. Further, there is no proof that the measures St. Alphonsus did follow, that of securing a detailed employment application, interviewing the applicant and verifying some of the prior employments listed, was not reasonable under the circumstances. Plaintiffs have offered no evidence of any different methods which would have produced different results. Plaintiff's suggestion that if they investigated harder they might have found something is insufficient to create a jury issue.

After he was hired Garcia was offered access to an "employee assistance program," or EAP, as a fringe benefit of his employment with St. Alphonsus. This pro-

gram was intended to provide mental health counselling to employees and the families of employees in need. In November of 1987, Garcia sought out a counsellor under the EAP, and revealed to her that he was troubled by what she said he termed a "sexual addiction," claiming that when he was feeling compulsive, "any partner would do." The counsellor discussed Garcia's problem with her professional supervisor, a clinical social worker. Both considered themselves bound by their professional rules of confidentiality as to patient communications. They determined that Garcia's revelations did not constitute the display of imminent threat to others nor identify any specific target. They concluded that they were bound by their professional rules of confidentiality to make no disclosures about what Garcia had said to anyone. Therefore, the counsellors under the EAP program did not reveal any of this to the hospital administration at any relevant time prior to the discovery proceedings of this lawsuit. The testimony of the counsellor about what Garcia had said to her was obtained only after Garcia waived the therapist-patient privilege after the remand in this case, in connection with discovery mandated by the appellate court. There is no dispute that none of this had come to light during the time Garcia was an employee of the hospital.

Also in November of 1987, Garcia approached several adult but under-age employees of the hospital and invited them out for a beer. One of the employees' father learned of this and complained to the hospital administration. Garcia was warned by the hospital administration not to invite under-age employees to go out drinking.

In August of 1988, John Doe, then age thirteen, was seriously injured in a bicycle accident. He was hospitalized at St. Alphonsus for approximately six weeks in August and September of 1988. Garcia was one of his respiration therapists, and apparently treated Doe on a regular basis while he was in the hospital. On the last day of Doe's stay, Garcia gave Doe his telephone number and told him to call sometime, suggesting that they could hang out together.

A month or so after Doe was released from the hospital, Doe contacted Garcia and the two commenced a friendship. On at least several occasions, Doe's parents drove Doe to Garcia's home for visits. There is no evidence or claim of any sexual misconduct during these early contacts. There is no evidence that the hospital was aware of any of them.

In June of 1989, Garcia was discharged at St. Alphonsus. He had again solicited an under-age employee to go drinking, despite the verbal warning. When the hospital administration found out about it, he was fired. After he was fired from St. Alphonsus, he became a taxi driver. Doe and his family were aware that Garcia had been terminated by the hospital, although they were not aware of the reason for it, and they were aware that he had become a taxicab driver.

Beginning in July of 1989, while Garcia was a taxi driver and after he had been discharged by the hospital, Garcia began to sexually molest John Doe. The molestation continued until 1992, when it was discovered by Doe's father. At no time during the continuation of this molestation was there any connection between Garcia and the hospital or between John Doe and the hospital.

Garcia was prosecuted and sentenced to prison. Doe and his father started this action against Garcia and the hospital. The hospital filed a motion for summary judgment. The plaintiff filed a motion for further discovery under IRCP 56(f). I denied the plaintiff's motion to permit further discovery, and granted summary judgment in favor of the hospital. Plaintiffs appealed and the appellate court reversed, holding that the additional discovery should have been permitted before the summary judgment was considered. All additional discovery has now been accomplished, and the hospital has again filed a motion for summary judgment.

\* \* \* \*

## Analysis

## I.

### Plaintiff Failed to Establish Negligence on the Part of the Hospital in the Hiring of Garcia.

There is no dispute that Garcia was a properly qualified respiration therapist when he applied for employment with the defendant hospital in 1987. He filled out and submitted a standard job application form to the hospital. He listed three nursing homes and a hospital in Nevada as his prior health care employment. The defendant's personnel manager contacted one of the previous employers and received a favorable recommendation. The other nursing homes would have advised that Garcia was a suitable employee if asked; neither would make any derogatory comments about his employment. The Nevada hospital would have confirmed that he was an employee of their hospital, but according to their policy would have made no further comment.

It was later learned, after all of the events giving rise to this lawsuit had come to light, that Garcia had been discharged from the hospital in Nevada for a sexual impropriety with an adult male patient. However, there is no evidence that the defendant in this case would have learned of this in connection with Garcia's job application. The deposition of the representative from the hospital in Nevada reveals that the only information which would have been given to the defendant would have been a confirmation of employment dates. The Nevada hospital would not have disclosed its reasons for firing Garcia upon inquiry from another employer seeking to confirm references.

Plaintiff argues that the defendant could have obtained a waiver from Garcia and requested his personnel files from the Nevada hospital. The argument is pure supposition. The Nevada hospital representative stated that the hospital would have sent the file to Garcia, if requested, but not to St. Alphonsus. There is no evidence of what was contained in the personnel file,

whether it would have revealed the true reason for his discharge, or whether the Nevada hospital would have left such material in the file before it was sent out. In any event, it is pure speculation to assume that Garcia would have transmitted the file intact to his prospective employer. Plaintiff's argument on this point is entirely too tenuous to support a theory of negligence and create an issue for the jury.

Garcia did reveal a DUI conviction on his employment application, but did not say anything about a criminal conviction of some kind in California in 1982 which did involve sexual improprieties. Plaintiff has offered no proof that the hospital could have discovered the California criminal conviction by any reasonable means. The only evidence in the record is that this criminal conviction does not show up on Idaho law enforcement records, and would not have been revealed to the hospital even if an inquiry had been made.

There is no evidence in the record that the hospital did not follow routine procedures in the hiring of a respiration therapist. There is no evidence that the hospital gained any information whatsoever which should have put it on inquiry that there was a potential problem in Garcia's background. There is no evidence that if the hospital had pursued all of the references, and talked to all of the prior employers, it would have found out anything of an incriminating nature against Garcia. Plaintiff's argument that Garcia's employment with nursing homes in positions below his credentials and after he left the Nevada hospital should have raised a suspicion on the part of the hospital is pure supposition. Even if the hospital had been suspicious, there is no proof of where they could have gone to find out anything different than what was revealed in the investigation they did accomplish.

I recognize that all sorts of ugly information has come out about Garcia since his criminal conviction stemming from the events of this case. However, the plaintiff cannot point to a single item of the ugly facts which was available to St. Alphonsus at the time of its decision to hire Garcia.

The test is not how malevolent Garcia turned out to be; the test is whether there was any indication of his despicable character which the hospital knew or should have detected prior to his hire. In this case, and on all the facts presented, I conclude that the plaintiff has failed to show any evidence of any indication of Garcia's latent pedophilia which was known to the hospital, or of which it should have been aware, at or prior to the decision to hire him in 1987.

The burden of proof is upon the plaintiff, and upon this failure of proof plaintiff's claim of negligence in hiring collapses. Defendant is entitled to a summary judgment on this theory.

## II.

### Plaintiff has Failed to Establish Any Evidence of Negligence in the Supervision of Garcia

Negligent supervision generally falls into three categories: (1) the supervisors failed to pay attention and respond adequately to complaints or comments from patients or outside sources about the conduct of an employee; (2) the supervisors failed to pay attention and respond to complaints or comments from co-workers and inside sources about the conduct of the employee; or (3) the supervisors failed to adequately observe the employee themselves, and become aware of signals or signs of improper performance.

There is no claim in this case that Garcia was not an adequate respiration therapist. There is no claim in this case that any sexual improprieties occurred between Garcia and Doe while Doe was a patient in the hospital. There is no claim in this case that any patient of the hospital complained or made any comment to anyone in the hospital administration about sexual improprieties between Garcia and a patient of the hospital. There is no claim in this case that any supervisor saw anything, or that there was ever anything to see, concerning Garcia and Doe pertaining to any improper contact between the two, or between Garcia and any other adolescent pertaining to improper sexual behavior.

The only evidence plaintiff offers to the issue of negligence supervision involves Garcia's interaction with two young co-employees. Garcia invited two under-aged young men, aged 18 and 19, to join him for a beer after work. The father of one of the young men objected to the hospital administration, and Garcia was reprimanded. When it happened again, he was fired.

According to all of the evidence available at the time, no one thought that Garcia's actions toward the two young men were sexual in nature. The father did not think the approach was sinister and gave no indication of such when reporting it to the hospital administration. He just did not want his under-age son drinking. The young men did not consider the invitations to be sexual; they thought Garcia was weird and perhaps homosexual, but they were not threatened. There is no evidence that the employees brought Garcia's possible homosexuality to the attention of the hospital administration. Mere homosexuality, in any event and even if mentioned to the hospital administration, would not give rise to any suspicion of pedophilia.

There is no indication that the hospital's approach of first reprimanding and then discharging Garcia was not appropriate under the circumstances then known to the hospital and all of the individuals involved. There is no suggestion that anybody thought that any of this had anything to do with the possibility of Garcia's pedophiliac attraction to adolescents.

The plaintiff argues that the hospital, as a tertiary care provider in the community, should have been aware of the proclivity of pedophiles to recruit and groom potential victims over a period of time, and that the invitation to the two young men could have been construed as the first move in the grooming process of a pedophile. However, the two young men in this instance were adults, not children. I see no rational basis to argue that the episodes involving drinking by under-aged adults could be construed as indicia of pedophiliac recruiting. For these reasons, and as is further discussed below, I decline to accept the

contention that a jury argument can be made out of the instance.

Plaintiffs argue that Garcia received no training in ethical conduct with patients. However, plaintiff offered no indication of what training should have been given, or even whether such training is available. The speculative contention is insufficient to create an issue of fact to take to a jury.

Taking all of the evidence before the court, and construing it most favorably toward the plaintiff's contentions, I am unable to find any proof of negligent conduct. There were no reports by patients or patients' families about Garcia or his conduct which the supervisors overlooked; there were no complaints from other workers about Garcia involving sexual misconduct or which had anything to do with possible pedophilia; the only complaints which were received were handled promptly; and finally, with the exception of the communications with the EAP counsellor, there is no evidence of any direct signs or signals which the hospital supervisors observed which could have tipped them off about Garcia's illicit proclivities. The EAP communications are privileged, as is noted below, and never came to the attention of the hospital administration.

The burden of proof is on the plaintiff on this theory, to point to some evidence of misfeasance or nonfeasance on the part of the hospital which could give rise to a jury question of negligence in the supervision of Garcia. I conclude that the plaintiff has failed to do so, and that the defendant hospital is entitled to summary judgment on this theory.

### III.

#### Garcia's Disclosures to the Employee Assistance Program Counsellor Remains Privileged.

The counsellors of the EAP are not parties to this suit, and neither they nor the hospital have been sued for malpractice for failing to warn of the dangerous proclivities of Garcia. The only testimony in the record is that the counsellors considered the disclosures made by Garcia to be confidential, and that they were bound by their professional code not to reveal any of them to anyone.

It is undisputed in this case that the mental health counsellors did not warn or notify the hospital administration of any of the deviant revelations made to them by Garcia. Plaintiff has failed to demonstrate that these mental health professionals had any duty to do so, or that any failure on their part is chargeable against the hospital.

Although enacted in 1991, Idaho Code § 6–1902 is instructive. This section requires a mental health professional to give a warning only where the professional has knowledge of an "explicit threat of imminent serious physical harm ... to a clearly identified or identifiable victim." The statute appears to codify the existing common law with reference to the professional standard to which mental health therapists and counsellors are bound. It is consistent with the client-therapist privileges of counsellors and social workers set forth as IRE 517 and 518. In this case, the only testimony from the counsellor involved with Garcia concerned his general feeling of sexual pressures. The counsellor testified that there was no explicit threat made and no identifiable victims. She discussed the case with her supervisor, and the two counsellors determined that there was no basis to violate their professional duty of silence.

Proof of a violation of the duty of the health care professionals in connection with their professional activities is governed by Idaho Code §§ 6–1012 and 6–1013. To prove a breach of the standard of care expected of health care providers, the plaintiff is obligated to produce expert testimony as required by Idaho Code § 6–1013 to the effect that the health care professional under examination failed to adhere to the standard of care expected of like providers in the community. Plaintiff has not done so in this case. There is no basis, then, to assert that the counsellors breached any duty owed in failing to disclose the content of Garcia's revelations. Therefore, there is no basis to assert liability on the part of the mental health provid-

ers in failing to warn of Garcia's potential dangers to others.

The question remains whether there can be any duty outside of the professional duty to deal with the revelations made to the counsellors by Garcia. I think not, on the undisputed evidence that the counsellors in fact did not reveal what Garcia said to anyone. There is no proof that the counsellors were involved in any way with the management of the hospital. There is no proof that they were expected to report to the hospital any details of the counselling conducted under the EAP programs; in fact, all of the proof was exactly the opposite: that they were expected to hold everything learned through the EAP program in strict confidence to maintain the credibility of the program.

Because the counsellors were under no duty professionally, and because there is no proof of any administrative expectations in this area, there is no basis to the argument that the hospital is charged with the knowledge of the mental health providers. Since there is no proof of breach of duty on the part of the counsellors, there can be no argument that the hospital is liable for malfeasance or nonfeasance of the counsellors under respondeat superior.

I conclude that the fact that Garcia sought assistance from the EAP program adds nothing to this case and has no impact upon the lack of proof of negligent hire or supervision as such affects the liability of the hospital.

## IV.

The Duty Owed Under Any Theory of Negligent Hire or Negligent Supervision Does Not Extend Past the Termination of Employment Under the Circumstances of This Case

The only evidence of contact between Doe and Garcia, other than the respiration therapy administered to Doe and over which there is no complaint, apparently occurred as Doe was leaving the hospital.

Garcia gave Doe his card and told him to call sometime, suggesting that they could hang out together. Instructive in this encounter is the recollection in the testimony that Garcia said, "Hi, my name is Fred." This is the only evidence of any social encounter at the hospital between the two that either of them recall. There is no evidence and no criticism of Garcia's conduct during any of the therapy sessions. There is no evidence of any other social encounter between the two during the time Doe was a patient in the hospital.[1]

Within a month after Doe was released from the hospital, a friendly relationship began between Doe and Garcia. The testimony indicates that the early contacts were not sexual or suggestive, but were overtly friendly. Doe's parents were aware of the friendship, and supported it. There is no evidence that the hospital was aware of any of this. It is undisputed that these social contacts were away from the hospital and while Garcia was on his own time. There is no contention that any of these contacts were purported to be connected to hospital business. There is no evidence or contention that Garcia pretended to be on hospital business or that he held himself out as a representative of the hospital in connection with these early encounters.

Finally, before any molestation began, Garcia was fired by the hospital. He soon went to work as a taxicab driver. Doe and his family knew that he had lost his job with the hospital, and that he was no longer working for St. Alphonsus. They knew his new job was driving a taxi. Shortly after he lost his job and began driving a taxi, he began the sexual molestation of Doe. Thereafter, no episode of sexual molestation ever occurred on the hospital premises.

The evidence is undisputed and clear that no misconduct or sexual impropriety of any kind transpired between Garcia and Doe on hospital property, or while Doe was

---

1. Doe testified that Garcia once told him that while Doe was in the hospital, Garcia had offered oral sex. Doe said this conversation happened about two years after he was in the hospital. However, Doe has no recollection of the event itself, and Garcia denied it ever actually happened.

a patient, or while Garcia was an employee. All events of molestation occurred away from the hospital, after Doe had been discharged as a patient, and after Garcia had been discharged as an employee. Under these circumstances, the hospital cannot be held liable in negligence, under any construction of plaintiff's case, under either the theory of negligent hire or negligent supervision, as a matter of law.

The first time around, the hospital conceded the issue of negligence for the purpose of its motion. I ruled that, accepting the hospital's concession, there still could be no proximate cause because the circumstances were too attenuated. The appellate court disagreed, and concluded that if negligence was assumed on the part of the hospital in bringing the two together, that negligence had to be construed broadly to the very limit of reason, leaving the fundamental issues of "but for" or "substantial factor" imbedded within the analysis of proximate cause to be jury issues.

In the renewed motion, the hospital does not concede negligence, but argues that there is no evidence of any negligence on its part. For the reasons stated above, I agree with the hospital. But even if I am wrong in my assessment of claims of negligence, I am no longer obligated to construe the extent of the claimed negligence broadly; I am obligated now to construe the allegations of negligence only to the limit of the evidence offered by the plaintiff. Based upon this evidence, I further conclude that none of the specific acts of nonfeasance or malfeasance alleged by the plaintiff on the part of the hospital could form the foundation for liability in this case because as a matter of law, the results in this case were not reasonably foreseeable at the time.

Foreseeability is a difficult concept. The appellate court noted that the issue is generally for the jury. However, and as the appellate court noted, foreseeability is determined as a matter of law when the issue is existence of a duty or the limitation of liability as a matter of legal policy.

The connection between foreseeability and duty is recognized in *Alegria v. Payonk*, 101 Idaho 617, 619 P.2d 135 (1980), wherein the court cited with approval *Kirby v. Sonville*, 286 Or. 339, 594 P.2d 818 (1979):

In general, it is held that "one owes the duty to every person in our society to use reasonable care to avoid injury to the other person in any situation in which it could reasonably be anticipated or foreseen that the failure to use such care might result in such injury."

In this case, I think the issue does turn on the existence of a duty—i.e., the existence of a duty of an employer towards a former patron of the business for the acts of a former employee which acts are not carried out on company premises. Alternatively, the issue turns upon the limitation of liability as a matter of legal policy based on the attenuation of the chain of proximate causation when the target actor is no longer in the employ of the defendant, the victim is no longer a customer, and the acts do not occur on company property.

In *Rife v. Long*, 127 Idaho 841, 908 P.2d 143 (1995), the supreme court discussed the standards to be applied when determining whether or not a duty should be recognized. The issue in that case was whether the duty of a school district to protect students from harm should be extended to activities of the students off the school premises, while the students were traveling home. This is somewhat analogous to the instant question, where the duty under examination is that of the hospital to protect individuals who are no longer patients from predators who are no longer employees for acts away from hospital premises. In concluding that the duties owed should not be extended, the court in *Rife* held:

Determining whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors which include:

"The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct, the policy of preventing future

harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved (citations omitted)."

*Isaacs v. Huntington Memorial Hosp.*, 38 Cal.3d 112, 695 P.2d 653, 658, 211 Cal.Rptr. 356 (Cal.1985). With respect to the foreseeability of the harm, this Court has stated:

"Foreseeability is a flexible concept which varies with the circumstances of each case. Where the degree of result or harm is great, but preventing it is not difficult, a relatively low degree of foreseeability is required. Conversely, where the threatened injury is minor but the burden of preventing such injury is high, a higher degree of foreseeability may be required."

*Sharp*, 118 Idaho at 300–01, 796 P.2d at 509–10 (citing inter alia, *Isaacs, supra*).

*Op. Cit.*, 127 Idaho, p. 846, 908 P.2d 143.

In my view, the purported duty which would have to be imposed upon the hospital in this case in order to create any liability to the plaintiff fails to satisfy any of the criteria established in *Rife*.

— (1) "Foreseeability of harm to the plaintiff (as a consequence of the alleged breach of duty)." As I read this criteria in context with the facts of this case, it asks to what extent should a hospital be expected to foresee the possibility of sexual misconduct by an employee towards a youthful patient off the hospital premises, after the patient has been discharged and after the employee has been fired? Stated another way, it asks to what extent can an adolescent patient and his parents reasonably expect the hospital to protect the youth from harm by a former employee which arises after the patient has been discharged, off the hospital premises, in activities which are not connected to hospital purposes, and which occur after the employee is no longer employed by the hospital? Whichever way this issue is examined, I think it is indisputable that the reasonable potential for foreseeability is very slight. Since the overwhelming authority holds that the liability of an employer for the acts of an employee—whether as a matter of respondent superior or for negligence in hiring and supervision—ends with the termination of employment, the only question is whether or not the fact that the hospital and former patient are involved should change the consideration. In my mind, it would be unacceptably burdensome and onerous to demand that a hospital should be expected to investigate all job applicants for their potential of becoming predatory pedophiles, at the risk of being held financially responsible for the consequences if an employee is hired who later proves to be afflicted, where that liability is extended beyond the termination of employment, to activities away from the hospital and with individuals who are no longer patients. Conversely, the risk of harm to the young patient is relatively slight, in that the youth was discharged back into the care of his parents. In my mind, this tips the balance of flexibility, expressed in *Rife v. Long* and quoted above, completely against any reasoned basis for extending the duty in this area either beyond the termination of employment or to activities away from the hospital or towards individuals who are no longer patients.

— (2) "The degree of certainty that the plaintiff suffered injury (as a consequence of the alleged breach of duty)." I think there is a substantial degree of uncertainty as the number of links in the chain of probability increased as the events moved from the introduction to the instigation of the abuse. The only thing that the hospital can be accused of in this case is providing the opportunity for Garcia and Doe to meet; but in reality, this could have happened elsewhere and at any time. Furthermore, there is no evidence that the hospital had any opportunity to intervene in the relationship after the introduction, as it developed entirely away from the hospital, while Garcia was on his own time and after Doe had been discharged. On

the other hand, there were undoubtedly others—certainly his parents, for example—who did have the opportunity to intervene but did not. When the chain of causation is so attenuated and the acts causing injury are so remote from the event giving rise to the claim of liability, I conclude that the balance tips against extending the duty on this aspect of the analysis.

— (3) "The closeness of the connection between the defendant's conduct and the injury suffered." There is no direct connection between the defendant's conduct and the molestation. There was no personal relationship between the hospital and Doe. The hospital's involvement with Doe was in August and September of 1988; the molestation did not begin until sometime in July of 1989. It did not occur on hospital premises. For the reasons noted in the examination of causation, any connections which did exist were significantly attenuated and remote. This element can have no significant bearing favoring the extension of a duty.

— (4) "The moral blame attached to the defendant's conduct." There is no cogent argument justifying the placing of any moral blame on the hospital administration, based merely upon the happenstance that this is where Doe met the individual who turned out to be a predatory pedophile. There is no contention that the hospital condoned or promoted the molestation in any way.

— (5) "The policy of preventing future harm." I recognize this aspect as a laudable objective. In my opinion, however, this objective is not sufficient to outweigh the counterbalancing negative consequences of extending the duty beyond the period of employment as discussed elsewhere.

— (6) "The extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach." The obvious burden which would arise if the duty is extended as plaintiff contends, to circumstances involving the interactions of former employees with former patients, is the questionable fairness of imposing liability for conduct over which the defendant has no control. To my mind, it is an unreasonable burden to expect the employer to continue to monitor the conduct of ex-employees in their interactions with former patients carried on away from the hospital, and that this tips the balance against recognition of a duty in this area.

For all of these reasons, I conclude that any duty owed by a hospital in connection with the hiring and supervision of a hospital employee, toward the potential for that employee sexually molesting a patient, would necessarily extend only to the activities of such employees which are conducted during the period of employment, or on hospital premises, or with current patients of the hospital. In all events, the duty owed under this theory of liability could not extend beyond the period of employment to actions of an individual who is no longer employed, toward a victim who is no longer a patient and where all of the acts giving rise to liability occurred away from the hospital premises.

The few cases cited by the plaintiff to oppose this conclusion are clearly distinguishable on their facts. *Lou–Con Inc. v. Gulf Building Services*, 287 So.2d 192 (La. App.1973), involved the rape of a customer by a delivery man. The actor was still in the employ of the target defendant at the time of the rape, and his job as a delivery person had taken him to the plaintiff's home during his regular employment. Similarly, in *Coath v. Jones*, 277 Pa.Super. 479, 419 A.2d 1249 (1980), a former employee of the defendant returned to a customer's home and raped her. He had been to her home as part of his regular employment and represented to her that he was there on the defendant's business at the time of the rape. In both cases, it was part of the employee's job to go to the homes of the defendant's customer, and in both cases the victims thought their assailants were on the job when they showed up at their doors.

In the instant case, Garcia was no longer employed by the hospital at the time the

molestation began, but was driving a taxi-cab, and Doe and his parents were fully aware of this. Further, no part of Garcia's regular job involved personal contacts with patients away from hospital premises, and neither Doe nor his parents had any reason to expect that he was on the job when he began the personal relationship that led to the molestation.

Finally, plaintiff cited *Marquay v. Eno,* 139 N.H. 708, 662 A.2d 272 (1992) where the court held that the school district could be held liable under theories of negligent hire and negligent supervision where teachers had molested students, where the episodes occurred off campus, after school hours, and even after graduation. However, the court in *Marquay* was responding to a certification from the federal court, and was therefore stating the law broadly under an assumed set of facts. It premised its findings in this area upon the notion that a special relationship existed between the school district and its students, whereby the district stood *in loco parentis* to its children. There is no such special relationship between a hospital and its former patients.

Most instructive to my mind is in the New Hampshire court's observation that there must be a casual connection between the wrong and the employment. The court held:

> A cause of action for negligent hiring or retention, however, does not lie whenever an unfit employee commits a criminal or tortious act consistent with a known propensity. As several courts have properly recognized, the plaintiff must establish "some [casual] connection between the plaintiff's injuries and the fact of the employment." [Citations omitted.] The casual requirement is necessary because "[w]ere such a connection not required, an employer would essentially be an insurer of the safety of every person who happened to come into contact with his employee simply because of his status as employee." [Citations omitted.]

*Marquay v. Eno,* 662 A.2d at p. 280.

I think the policy on this point is succinctly stated in *Pittsburgh Nat. Bank v. Perr,* 431 Pa.Super. 580, 637 A.2d 334 (1994):

> Even where a harm to a particular plaintiff may be reasonably foreseeable from the defendant's conduct, and that conduct is the cause-in-fact of the plaintiff's harm, the law makes a determination that, at some point along the casual chain, liability will be limited. The term "proximate cause", or "legal cause" is applied by courts to those considerations which limit liability, even where the fact of causation can be demonstrated. Because of convenience, public policy, or a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point, as no longer a "proximate" or "legal" consequences [sic] naturally flowing from the wrongdoer's misconduct. To put it simply, at a certain point, negligent conduct will be viewed as too remote from the harm arising to the plaintiff, and thus not a substantial factor in bringing about the plaintiff's harm.

> Whether the analysis proceeds in terms of "duty", "foreseeability", or "proximate cause", we must remain mindful of Prosser and Keetons admonition that our essential inquiry in these cases is the same:

> "in all of these proposed rules and formulae the courts and writers have been groping for something that is difficult, if not impossible, to put into words: some method of limiting liability to those consequences which have some reasonably close connection with the defendant's conduct and the harm which it originally threatened, and are in themselves not so remarkable and unusual as to lead one to stop short of them." (Citations omitted.) *Pittsburgh Nat. Bank v. Perr,* 431 Pa.Super. 580, 637 A.2d 334 (1994), at p. 337.

I think the overwhelming weight of authority is that the liability of an employer for the negligent hiring or supervision of an employee ends with the termination of employment of the employee, whether ex-

pressed as the limitation of liability as a matter of policy, or as the lack of a duty owed. I recognize the language in the appellate opinion which seems to say that the determination of proximate cause and foreseeability are "nearly always" issues for the jury. However, I do not construe the appellate opinion as declaring the law of the case in this instance to mandate a jury trial on the issue of extension of the duty owed or forbidding an examination of foreseeability as a matter of the definition of the duty owed after full discovery. Therefore, and for the reasons stated above, I conclude that the defendant hospital owed no duty to the plaintiff in this case that extended beyond Garcia's termination of employment. Defendant is entitled to a summary judgment on this point.