# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39319

| | |
|---|---|
| GREGORY and CARALEE BEERS, individually and on behalf of HEIDI L. BEERS, a minor, | ) ) ) ) |
| Plaintiffs-Appellants-Cross-Respondents, | ) ) |
| v. | ) ) |
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; WARREN RIRIE; PHIL and MERLINDA HAUETER, husband and wife; GARRETT HAUETER, an individual; RICHARD and KATHY KARTCHNER, husband and wife; BETH RASMUSSEN; MARK KROPF; KIRT and KATIE NIELSEN, husband and wife; BRADLEY J. DAY, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants-Respondents, | ) ) |
| and | ) ) |
| SHAROLYN RIRIE, an individual; BRENT RASMUSSEN, an individual; BRENDA KROPF, an individual; GARRETT HAUETER, an individual, | ) ) ) ) ) |
| Defendants-Respondents-Cross-Appellants. | ) ) ) |

Boise, June 2013 Term

2013 Opinion No. 131

Filed: December 11, 2013

Stephen Kenyon, Clerk

SUBSTITUTE OPINION, THE COURT'S PRIOR OPINION DATED NOVEMBER 26, 2013 IS HEREBY WITHDRAWN.

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Michael Wetherell, District Judge.

The decision of the district court is <u>affirmed</u> in part, <u>reversed</u> in part and the case is <u>remanded</u> for proceedings consistent with this opinion.

Murphy Law Office, PLLC, Meridian, for appellants. Michaelina B. Murphy argued.

1

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, for respondent The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints. Larry C. Hunter argued.

Parsons Behle & Latimer, Boise, for respondents Ririe, Haueter, Rasmussen and Kropf. Joseph Kevin West argued.

─────────────────────────────────────────────

HORTON, Justice.

Heidi Beers, a minor, was injured after jumping from a bridge into the Payette River. Heidi had been attending a campout organized by ward members of her church. Her parents, Gregory and Caralee Beers, brought suit individually and on behalf of their daughter against the Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the COP) and fourteen individual defendants. The Beerses' complaint advanced claims of negligence against all defendants and a claim based upon I.C. § 6-1701 (tort actions in child abuse cases) against the individual defendants. The district court granted the defendants' motions for summary judgment in part, dismissing all negligence claims except for those brought against two individual defendants, Richard and Kathy Kartchner, who have not participated in this appeal. The district court denied the motion for summary judgment as to the statutory claim against five individual defendants, including Richard Kartchner. The Beerses timely appealed and the four individual defendants have cross-appealed from the district court's order denying their motion for summary judgment as to the statutory claim. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Heidi Beers was thirteen years old when she was injured. She belonged to the Autumn Faire Ward (the Ward) of the Church of Jesus Christ of Latter-day Saints (the Church)[1] in Meridian, Idaho. The Ward organized a campout to take place in Smiths Ferry, Idaho, during the summer of 2007. Ward members were invited to a campout to be held August 17-18, 2007, at a cabin owned by Frank and Gloria Skinner. A similar campout had been held in 2005 and 2006. In 2007, the campout was planned by Lisa Panek, chair of the Ward Activities Committee. Ward

---

[1] A congregation of Church members is known as a ward, presided over by a bishop. Ward members may have a "calling," consisting of an assignment of service to the ward. Each ward is part of a regional grouping known as a stake, which consists of several wards. The stakes report to the corporate management of the COP.

2

members were notified of the upcoming event through flyers and a sign-up sheet for a Dutch oven dinner. The only formal activities planned for the campout were the Dutch oven dinner, an evening devotional, and a breakfast. There was no RSVP required and no list of attendance taken.

Heidi wanted to attend, however her parents were not interested in going. Heidi originally planned to attend with a friend's family, but they could not go. Heidi then contacted another friend and asked if she could "get a ride" to the campout. This friend spoke to her mother, Kathy Kartchner, and asked if they could give Heidi a ride to the campout. Ms. Kartchner agreed and testified that it was her understanding that she was only providing a ride to Heidi, as Heidi's grandfather would also be attending the campout. Heidi's parents did not speak with any Ward member regarding Heidi's attendance. The record is silent as to whether Heidi's grandfather agreed to look out for her during the campout.

Heidi rode up with the Kartchners on the evening of Friday, August 17. After her arrival, she rode from the Skinners' cabin to the Smiths Ferry Bridge with around twenty other youths in Bradley Day's pickup. Mr. Day told the youths that he would take them to the bridge if they obtained their parents' permission. After confirming that they had received permission, Mr. Day took them down to the bridge. Heidi had not sought or obtained permission from anyone to attend. Upon arriving at the bridge, some of the youths checked under the bridge for rocks or other obstructions. Many then proceeded to jump from the bridge into the river. Heidi did not jump. There were no injuries that evening and the youths then returned to the campsite.

Heidi spent the evening with her friends, and they stayed up late talking. Rather than sleeping in a tent provided by the Kartchners, Heidi and her friends slept in the Skinners' cabin. The next morning, following breakfast, members of the Ward began to separate. Some returned home, others went hiking or fishing, and some returned to the bridge to play in the water and jump into the river. Heidi went to the bridge. Before anyone jumped from the bridge, there was another inspection for rocks or other obstructions. Garrett Haueter, an adult present at the bridge, told everyone to jump in the location that had been checked.

Many of those present then began to jump from the bridge into the river. Heidi spoke briefly to Sharolyn Ririe, another adult present at the bridge. Heidi told her that she was scared to jump. Ms. Ririe said that she would also be afraid to jump, as she had a fear of heights. Eventually, Heidi summoned the courage to jump. She climbed over the railing but was outside

the area that had been inspected. Heidi hit the water and felt instant pain and numbness. She does not believe that she hit anything on the way down or that she hit the river bottom. Thus, it appears that she jumped directly over one of the bridge support columns. Regardless of the mechanism of injury, Heidi suffered a compound fracture of her ankle. Several of those present helped Heidi to shore where she was attended to by several Ward members.

Defendant Mark Kropf, a physician and Ward member, was summoned. He arrived and attended to Heidi with the help of paramedics from Cascade, as well as an emergency room team from St. Alphonsus that happened to be floating the river. One of the emergency room team members, Dr. Ho, was a physician with expertise in dealing with trauma. Dr. Ho reduced the fracture and brought the bone back within the skin. Heidi was then transported by Life Flight to the hospital.

Heidi's parents then brought this action, individually and on Heidi's behalf, against the Church and fourteen Ward members, asserting claims of negligence and civil child abuse under I.C. § 6-1701[2] against the individual defendants and claiming negligence on the part of the COP. The COP and the Ward members moved for summary judgment.[3] The Beerses did not oppose the request for summary judgment dismissing their claims against three defendants, Merlinda Haueter, Kirt Nielsen and Katie Nielsen. The district court granted the motions as to the Beerses' negligence claims against all other defendants except Richard and Kathy Kartchner, holding that

---

[2] Idaho Code § 6-1701 provides as follows:

(1) An action may be brought by or on behalf of any child against any person who has:

    (a) Willfully and lewdly committed any lewd or lascivious act or acts upon or with the body or any part or member of a child under the age of sixteen (16) years as defined in section 18-1508, Idaho Code; or

    (b) Sexually abused any child as defined in section 18-1506, Idaho Code; or

    (c) Sexually exploited any child for a commercial purpose as defined in section 18-1507, Idaho Code; or

    (d) Injured a child as defined in section 18-1501, Idaho Code.

(2) If an act prohibited under subsection (1) of this section involves employment-related circumstances as provided under section 6-1607(2), Idaho Code, then an action may be brought under the common law by, or on behalf of, any child against the employer of the person who committed the act, subject to the requirements of section 6-1607, Idaho Code.

(3) The civil causes of action provided for in this section exist independently of any criminal action commenced pursuant to chapter 15, title 18, Idaho Code. A civil action may be pursued under the provisions of this chapter even if a criminal prosecution is not pursued.

[3] Richard Kartchner did not request summary judgment as to the claim of civil child abuse.

4

neither the COP nor the Ward members[4] owed Heidi a duty of care. The Beerses appeal, arguing that both the COP and the Ward members owed Heidi a duty of care arising out of a special relationship and the undertaking of a duty to supervise her.

The district court denied the motions for summary judgment as to the child abuse claim against four Ward members (Sharolyn Ririe, Garrett Haueter, Brenda Kropf and Brent Rasmussen) who were present when Heidi was injured. The district court found that there was a genuine issue of material fact as to whether they should have known that Heidi was likely to be injured. These four Ward members cross-appeal, arguing that the district court erred by finding that an affirmative duty to act exists in the absence of a special relationship to the child.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c); *G & M Farms v. Funk Irr. Co.*, 119 Idaho 514, 516-17, 808 P.2d 851, 853-54 (1991). Furthermore, "[a]ll doubts are to be resolved against the moving party, and the motion must be denied if the evidence is such that conflicting inferences may be drawn therefrom, and if reasonable people might reach different conclusions." *Id*.

> Generally, to state a cause of action for negligence, a plaintiff must establish four elements: "(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage."

*Grabicki v. City of Lewiston*, 154 Idaho 686, ___, 302 P.3d 26, 31 (2013) (quoting *Fragnella v. Petrovich*, 153 Idaho 266, 272, 281 P.3d 103, 109 (2012)). "Whether a duty exists is a question of law, 'over which this Court exercises free review.' " *Gagnon v. W. Bldg. Maint., Inc.*, 155 Idaho 112, ___, 306 P.3d 197, 200 (2013) (quoting *Turpen v. Granieri*, 133 Idaho 244, 247, 985 P.2d 669, 672 (1999)).

---

[4] From this point forward in this opinion, the use of the phrase "the Ward members" is intended to relate only to the nine individual defendants who are party to this appeal. It does not include Richard Kartchner, Kathy Kartchner, Merlinda Haueter, Kirt Nielsen, or Katie Nielsen.

## III. ANALYSIS

**A.  The district court properly granted summary judgment as to the Beerses' negligence claims.**

The Beerses argue that the district court erred in finding that the COP and the Ward members owed no duty to Heidi. As previously noted, a cause of action for negligence must establish: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399, 987 P.2d 300, 311 (1999).

The critical inquiry in this appeal, as it relates to the negligence claim, is whether the COP or the Ward members owed a duty to Heidi. The Beerses rely upon our statement that "one owes a duty to every person in our society to use reasonable care to avoid injury to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury." *Doe v. Garcia*, 131 Idaho 578, 581, 961 P.2d 1181, 1184 (1998). However, contrary to the Beerses' contention, this statement extracted from *Garcia* does not impose an affirmative duty on everyone to prevent foreseeable injury to everyone else. Rather, the broad statement in *Garcia* must be viewed in the context of that case.

Garcia was hired by St. Alphonsus Regional Medical Center as a respiratory therapist. *Id.* at 579, 961 P.2d at 1182. Shortly after being hired, he sought the services of the Employee Assistance Program, staffed by employees of the defendant hospital, for his preoccupation with sex. *Id.* During a counseling session, he told his counselor that he had been terminated from another hospital for "molesting a patient." *Id.* His previous employer had a policy that it would release former employees' personnel files upon written request, but St. Alphonsus made no such request. *Id.* at 580, 961 P.2d at 1183. Doe was a minor who was hospitalized at St. Alphonsus for six weeks approximately a year after Garcia was hired. *Id.* at 579, 961 P.2d at 1182. Following his discharge from the hospital, Garcia began to sexually molest Doe. *Id.*

This Court evaluated whether the hospital owed a duty to Doe, employing the "balancing of the harm" analysis. *Id.* at 581, 961 P.2d at 1184. This is an analysis that this Court employs "in those rare situations when we are called upon to extend a duty beyond the scope previously imposed, or when a duty has not previously been recognized." *Rife v. Long*, 127 Idaho 841, 846, 908 P.2d 143, 148 (1996). In *Rife*, we explained the analysis as follows:

> Determining whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors which include:
>> [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved (citations omitted).

*Id.* (quoting *Isaacs v. Huntington Memorial Hosp.*, 695 P.2d 653, 658 (Cal. 1985)). After reviewing these criteria, this Court determined that the hospital owed a duty to Doe. *Garcia*, 131 Idaho at 581, 961 P.2d at 1184.

The broad statement the Beerses rely upon is not generally applicable to the world at large. Indeed, we abrogated the holding of *Garcia* in *Hunter v. State, Dep't of Corr., Div. of Prob. & Parole*, 138 Idaho 44, 50, 57 P.3d 755, 761 (2002), holding that *Garcia* "extend[ed] the duty of an employer too far." Otherwise, the general rule that "[t]here is ordinarily no affirmative duty to act to assist or protect another absent unusual circumstances, which justify imposing such an affirmative responsibility" would be devoid of meaning. *Coghlan*, 133 Idaho at 399, 987 P.2d at 311. Absent unusual circumstances, a person has no duty to prevent harm to another, regardless of foreseeability. Thus, in order to establish that any of the parties had a duty toward Heidi, the Beerses must establish one of the "unusual circumstances" described in *Coghlan*. Idaho law recognizes two circumstances in which a person has an affirmative duty of care to another: a special relationship or an assumed duty based on an undertaking. Recognizing the general rule, the Beerses argue that the COP and the Ward members owed a duty to Heidi under both of these theories. We discuss them in turn.

**A. The district court did not err in determining that there was no special relationship between the COP and Heidi.**

The Beerses first argue that the COP owed a duty to Heidi based on a special relationship that existed between the Ward and Heidi. "An affirmative duty to aid or protect arises only when a special relationship exists between the parties." *Rees v. State, Dep't of Health & Welfare*, 143 Idaho 10, 15, 137 P.3d 397, 402 (2006) (quoting *Coghlan*, 133 Idaho at 399, 987 P.2d at 311). A special relationship can have two separate but related aspects. The Restatement (Second) of Torts states that "(a) a special relation exists between the actor and a third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between

7

the actor and the other which gives the other a right to protection." *Turpen v. Granieri*, 133 Idaho 244, 248, 985 P.2d 669, 673 (1999) (quoting RESTATEMENT (SECOND) TORTS § 315 (1966)). Thus, having control over someone or a duty to protect that person is indicative of a special relationship.

This Court has listed examples of individuals having a duty to control another as "a parent's duty to control his child, an employer's duty to control an employee while at work, or a law enforcement officer's duty to control a dangerous prisoner." *Turpen*, 133 Idaho at 248, 985 P.2d at 673. "The common element in each of these is knowledge of an unreasonable risk of harm and the right and ability to control the third party's conduct." *Id*. Thus, a special relationship imposing a duty to control another's conduct requires a foreseeable risk and the right and ability to control that person's conduct. Determining whether a special relationship exists that gives a person the right to protection "requires an evaluation of 'the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection.'" *Rees*, 143 Idaho at 15, 137 P.3d at 402 (quoting *Coghlan*, 133 Idaho at 399, 987 P.2d at 311).

In *Coghlan*, this Court held that a university did not have "the kind of special relationship creating a duty to aid or protect adult students from the risks associated with the students' own voluntary intoxication." 133 Idaho at 400, 987 P.2d at 312. In that case, a sorority student was injured after falling out of a window following a night of excessive drinking. The Court noted the "adult status of modern college students and the diminished custodial role of modern universities" in determining that the university had no duty to protect the student from the risk of drinking alcohol. *Id*. The concept of custody was also discussed in *Rife*. There, the question was whether a school had a duty to ensure that a student travelled home safely at the end of the school day. This Court explained that although it had "recognized a common law duty to protect against the reasonably foreseeable risk of harm to a student while in the District's custody, we have not previously extended that duty once the student is no longer in a relationship of control or supervision by the District." 127 Idaho at 846, 908 P.2d at 148. Thus, a special relationship requires some level of custody, which *Rife* equated with control or supervision.

In *Rife*, because the student was no longer in the custody of the school, the traditional duty derived from the school's custody of the child did not apply. The Court then applied the balancing of harm analysis and declined to extend the duty to situations after the student is

8

released from the school district's custody, finding the burden would be too large to impose a duty on schools to ensure that the students travelled to and from school safely. 127 Idaho at 847, 908 P.2d at 149. Further, this Court noted that schools are merely releasing the children back into their parents' custody at the end of the school day. Thus, the duty was on the parents to ensure the children's safety. *Id*.

In this case, the district court found that there was no special relationship between the Ward and Heidi. It found that the Ward did not exercise sufficient control over Heidi to rise to the level of custody. It further found that even if a special relationship did exist, it ended along with the campout after breakfast on Saturday morning. The Beerses argue that the district court erred in these findings because the Ward did exercise control over Heidi and the determination that the Ward campout had concluded was an impermissible finding of fact that should be determined by a jury. We do not reach the second finding, because we conclude that the district court properly concluded that the Ward did not have a special relationship with Heidi that would impose upon it a legal duty to prevent her injury on the bridge.

First, Heidi's participation in the loosely-organized campout is a completely different situation than that of a child's attendance at school. School attendance is legally mandated. During the school day, parents have no ability to supervise or protect their children. That was not the case at the Ward campout. Thus, the custody-derived duty acknowledged in *Rife* between a school and its students during the school day does not apply here. The COP argues that the situation is more akin to the adult student and the university situation presented in *Coghlan*. The district court in this case noted that "[p]roviding food, shelter, and enforcing minor rules is precisely the level of care and control that a sorority exercises over its members." As was the case with the sorority in *Coghlan*, there is no evidence that the Ward had any right or ability to control Heidi's actions. The Ward did not have the ability to compel Heidi's attendance at the campout or the Ward-planned activities of dinner, a devotional, and breakfast.

The Beerses suggest that this Court ought to extend or recognize a new duty by weighing the various factors outlined in *Rife*. The district court in this case analyzed the *Rife* factors and determined that extending a duty owed by the Ward members was not appropriate. The district court found that the first two factors were undisputed: injury from bridge jumping is foreseeable, and Heidi was in fact injured. However, the court also found that none of the Ward members had undertaken supervision of the bridge-jumping activity. Thus, it found that the connection

9

between the defendants' conduct and Heidi's injury was too attenuated to impose a new duty. That connection is even more attenuated when the defendant is the COP rather than the individual Ward members. By all accounts, the bridge jumping was not an official Ward activity, it occurred a mile away from the location of the campout, and it took place after the conclusion of the last Ward-planned activity. We are unable to ascribe moral blame to the COP for this incident. We can, however, ascertain negative consequences to the community that would result from imposing a duty and resulting liability upon religious organizations to members of their faith. The result would be a powerful disincentive to organized fellowship activities. Thus, we decline to extend or create a new duty on the part of the COP toward Heidi.

**B. The district court did not err in finding that the COP did not assume a duty to Heidi.**

"Even when an affirmative duty generally is not present, a legal duty may arise if one voluntarily undertakes to perform an act, having no prior duty to do so." *Baccus v. Ameripride Servs., Inc.*, 145 Idaho 346, 350, 179 P.3d 309, 313 (2008) (internal quotation omitted). In such a case, the acting party has a duty to perform that act in a non-negligent manner. *Udy v. Custer Cnty.*, 136 Idaho 386, 389, 34 P.3d 1069, 1072 (2001). "When a party assumes a duty by voluntarily performing an act that the party had no duty to perform, the duty that arises is limited to the duty actually assumed." *Martin v. Twin Falls School Dist. No. 411*, 138 Idaho 146, 150, 59 P.3d 317, 321 (2002). Thus, merely because a party acts once does not mean that party is forever duty-bound to act in a similar fashion. A beach-goer may assume a duty to rescue a drowning swimmer in a non-negligent manner by undertaking to do so, but that same beach-goer has no obligation to rescue anyone else. In *Martin*, the school district was not required to post crossing guards at every school crossing even though it had provided crossing guards at certain crossings. Thus, although a party may assume a duty by undertaking to act, that duty is limited to the scope of the undertaking.

"Liability for an assumed duty, however, can only come into being to the extent that there is in fact an undertaking." *Udy*, 136 Idaho at 389, 34 at 1072. "A duty arises in the negligence context when one previously has undertaken to perform a primarily safety-related service; others are relying on the continued performance of the service; and it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking."

10

*Baccus*, 145 Idaho at 351, 179 P.3d at 314.[5] In *Baccus*, the defendant had contracted to place non-slip safety mats at the entrance of a building. The defendant failed to place the safety mats on one occasion and Baccus slipped, fell and was injured. This Court found that by undertaking to place the safety mats which induced reliance by those in the building where the accident occurred, the defendant had assumed a duty by undertaking to perform an action. *Id*. at 352, 179 P.2d at 315.

The district court in this case found that the Ward had not undertaken supervision of Heidi. It stated that the Ward's knowledge that some minors may attend the campout unsupervised did not constitute an undertaking to supervise Heidi. The Beerses argue that the COP assumed a duty to Heidi because the Church Handbook requires supervision of youth participating in ward activities and there was "Ward Leadership" at the bridge. However, these facts do not rise to the level of an undertaking that creates a duty of care. In *Baccus* there was a failure to perform a safety-related function that the defendant had previously performed. In *Martin*, there was no duty to monitor a school crossing even though other crossings were monitored. "The underlying policy here arises from a person voluntarily assuming a position, and by filling that position another can reasonably rely on that person to act with reasonable care and provide protection from unreasonable risks of harm." *Turpen*, 133 Idaho at 248, 985 P.2d at 673. Here, the COP's only affirmative actions were extending an open invitation to all Ward members to attend a campout and planning two meals and a devotional. These actions do not reflect the assumption of a duty by the Ward to supervise Heidi jumping from a bridge a mile away from the location of the Ward campout upon which she could reasonably rely. For this reason, we affirm the district court's grant of summary judgment to the COP.

## C. The district court did not err in finding that the Ward members did not have a special relationship with Heidi.

The law regarding duty as between Heidi and the Ward members is the same as explained above. Thus, the only consideration is whether there are facts relating to the individual Ward members sufficient to demonstrate the existence of a duty by them, whether founded upon a

---

[5] We do not intend to suggest that assumed duties exist only in the context of safety-related undertakings. To the contrary, the rule is that "if one voluntarily undertakes to perform an act having no prior duty to do so" then a duty "arises to perform the act in a non-negligent manner." *Vincent v. Safeco Ins. Co. of Am.*, 136 Idaho 107, 110, 29 P.3d 943, 946 (2001) (citing *Featherston v. Allstate Ins. Co.*, 125 Idaho 840, 843, 875 P.2d 937, 940 (1994)). Our attention to precedent relating to safety-related undertakings simply reflects the nature of the undertaking alleged by the Beerses.

special relationship or the assumption of a duty. The district court found that none of the Ward members had a special relationship with Heidi. The Beerses devote a substantial portion of their brief to advance their argument that the Ward members owed a duty to Heidi because the risk of harm was foreseeable. The district court found that the risk of harm was foreseeable. It declined to extend a new duty in this situation because it found the connection between the Ward members' actions and Heidi's injury was not sufficiently close, not because of a lack of foreseeability.

As explained above, a special relationship requires a right and an ability to control the conduct of the third party. There is no evidence that the Ward members had such a relationship with Heidi. None of the nine individual Respondents can be said to have had custody of Heidi at any time during the campout, let alone at the time of her injury. Heidi's parents did not speak to anyone regarding her attendance at the Ward campout. When Heidi decided to go down to the bridge, she did so without seeking or obtaining permission from any of the individual Ward members. The facts do not demonstrate that any of the Ward members exercised the level of control over Heidi that would justify imposing a duty based on a special relationship. Thus, the district court properly determined that the Ward members did not owe Heidi a duty because there was no special relationship.

The other basis for finding the existence of a duty is that one or more of the Ward members undertook a duty of supervision toward Heidi. The Beerses argue that eight of the Ward members (Warren Ririe, Sharolyn Ririe, Phil Haueter, Beth Rasmussen, Mark Kropf, Bradley Day, Garrett Haueter and Brent Rasmussen) assumed a duty to Heidi. The district court found that none of the Ward members had undertaken any action to supervise Heidi or the bridge-jumping activity. Each of the individual defendant Ward members will be discussed below, considering any of their actions that may have given rise to an assumed duty to Heidi.

Warren Ririe

Warren Ririe's only connection to Heidi is by virtue of his calling as the High Priests group leader. When no member of the Bishopric was at the campout, leadership responsibilities would have fallen to him. However, as the Ward, and thereby the COP, owed no duty to Heidi at the bridge, Warren Ririe did not assume a duty to Heidi.

Sharolyn Ririe

12

Sharolyn Ririe was present at the bridge when Heidi was injured. She was there to watch her children, who were also at the bridge. While she was there she asked some of the youths on two separate occasions if they had checked the water for rocks or other hazards. She also had the conversation with Heidi in which Heidi indicated that she was fearful, and Sharolyn Ririe said that she would be fearful as well. These facts do not give rise to a reasonable inference that Sharolyn Ririe was supervising the bridge jumping in general, or Heidi in particular, much less that Heidi could reasonably rely upon her supervision. Sharolyn Ririe did not assume a duty to Heidi.

### Phil Haueter

Phil Haueter's children told him they would be down by the river. He went looking for them on Saturday morning. He walked downstream, never found them, and returned to the cabin. He received word that Heidi was injured and stayed at the cabin, packing up his things. He was never at the bridge on the day Heidi was injured. He did not assume a duty to Heidi.

### Beth Rasmussen

Beth Rasmussen was not present at the bridge at any time prior to Heidi's accident. There is no indication that Beth Rasmussen had anything to do with the bridge jumping other than knowing that several children, including her own, were headed down to the river. Beth Rasmussen did not assume a duty to Heidi.

### Mark Kropf

Mark Kropf was not at the bridge when Heidi was injured. He had been there briefly prior to the accident to check on his wife and children. He then returned to the cabin to find one of his daughters who was not at the bridge. After finding her at the cabin, he was walking back to the bridge when he was notified that Heidi had been injured. As there is no evidence that he was involved in any way with the bridge jumping, he did not assume a duty to Heidi.

### Bradley Day

Bradley Day was not present at the bridge when Heidi was injured. His involvement with bridge jumping occurred the evening before, when he transported a number of children to the bridge to jump. The Beerses argue that his actions the evening before obligated him to supervise the bridge jumping the following day. However, as we held in *Udy v. Custer Cnty.*, 136 Idaho 386, 389, 34 P.3d 1069, 1072 (2001), the duty to act is limited to the discrete episode in which the aid is rendered. The district court correctly determined that, assuming he had undertaken a

13

duty to supervise bridge jumping on Friday evening, this duty did not extend to the following day.

### Garrett Haueter

Garrett Haueter was present at the bridge when Heidi was injured. He testified that he witnessed some of the youths check the water for hazards as well as for depth. He also warned the jumpers that only a specific area under the bridge had been inspected. Of all the defendants, Garrett Haueter had the most active role on the bridge when Heidi was injured. However, the district court found that his actions did not rise to the level of undertaking supervision. The district court stated that "Garrett relayed information about where the river had been inspected. He never personally inspected the area nor did he direct the inspection of the area. Furthermore, there is no indication that he exercised control over where the jumpers actually jumped." Indicating where the bridge and river had been inspected did not constitute assumption of the duty to direct, control, supervise or prevent any person from jumping from the bridge. For this reason, we conclude that Garrett Haueter did not assume a duty to Heidi.

### Brent Rasmussen

Brent Rasmussen was not present on the bridge when Heidi was injured. However, he was back and forth between his car and the bridge when the jumping occurred on Saturday. The district court noted that the Beerses relied on the testimony of Sharolyn Ririe and Brenda Kropf that they gave the children permission to jump "because they believed [Brent Rasmussen] was supervising the bridge jumping activity." The district court noted that the record did not support the Beerses' assertion, as it merely demonstrated that "Brother Rasmussen" was present at the bridge and Ms. Kropf believed that "her children should be supervised while at the bridge." These witnesses' subjective expectations, unsupported by any objective evidence that Brent Rasmussen did or said anything to suggest that he was supervising the bridge jumping, is insufficient to demonstrate a genuine issue of material fact as to whether he assumed a duty to Heidi.

For these reasons, we find that the district court correctly granted summary judgment as to the Beerses' claims of negligence.

**D. The district court erred by denying the Ward members' motion for summary judgment as to the Beerses' claim based upon the tort of child abuse.**

The Beerses also brought claims against the individual Ward members for the tort of child abuse based upon I.C. § 6-1701. The district court granted summary judgment in favor of

14

those Ward members who were not present at the time of Heidi's injury as to this claim. The Beerses do not appeal this determination. However, the district court denied the motion as to Sharolyn Ririe, Garrett Haueter, Mark Kropf and Brent Rasmussen. These four Ward members cross-appeal the district court's order denying their motion for summary judgment. We address the preliminary question whether the cross-appeal is properly before this Court before turning to the merits of the cross-appeal.

      1. <u>This Court may properly address the merits of the cross-appeal.</u>

      The Beerses object to this Court's consideration of the cross-appeal, noting the general rule that "an order denying a motion for summary judgment is neither a final order that can be directly appealed nor is it an order that can be reviewed on an appeal from a final judgment in the action." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 890-91, 234 P.3d 1069, 1078-79 (2010). This statement is true for direct appeals. However, a different rule applies when the denial of a motion for summary judgment is presented by way of cross-appeal. Idaho Appellate Rule 15 provides:

> (a) **Right to cross-appeal.** After an appeal has been filed, a timely cross-appeal may be filed from any interlocutory or final judgment or order.

Idaho Appellate Rule 11(g) likewise provides the right to cross-appeal "any interlocutory or final judgment[,] order or decree." An order denying a motion for summary judgment is an interlocutory order. *Garcia v. Windley*, 144 Idaho 539, 541, 164 P.3d 819, 821 (2007). Thus, this Court has previously addressed the cross-appeal of an order denying a defendant's motion for summary judgment. *Stephens v. Stearns*, 106 Idaho 249, 253, 678 P.2d 41, 45 (1984). The cross-appeal is properly before this Court.

      2. <u>The district court erred by denying the Ward members' motion for summary judgment.</u>

      Idaho Code section 6-1701(d) provides that an action may be brought on behalf of any child against anyone who has "[i]njured a child as defined in section 18-1501, Idaho Code." Idaho Code section 18-1501(2) provides:

> Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health may be endangered, is guilty of a misdemeanor.

15

Idaho Code section 18-1501(5) defines "willfully" as "acting or failing to act where a reasonable person would know the act or failure to act is likely to result in injury or harm or is likely to endanger the person, health, safety or well-being of the child."

This Court addressed this broad definition of willfully in *Steed v. Grand Teton Council of the Boy Scouts of Am., Inc.*, 144 Idaho 848, 172 P.3d 1123 (2007), stating:

> In 2005, the legislature amended Idaho Code § 18–1501 to create a negligence standard of care for the conduct in that statute that must be done "willfully." It defined "willfully" in the statute to mean "acting or failing to act where a reasonable person would know the act or failure to act is likely to result in injury or harm or is likely to endanger the person, health, safety or well-being of the child." Ch. 151, § 1, 2005 Idaho Sess. Laws 467. Defining "willfully" to mean what "a reasonable person would know" is a negligence standard of care. *Ahles v. Tabor,* 136 Idaho 393, 34 P.3d 1076 (2001) (a reasonable person standard encompasses the concept of ordinary negligence); *Nelson v. Northern Leasing Co.,* 104 Idaho 185, 657 P.2d 482 (1983) (finding of negligence upheld based upon the risk to a child that a reasonable person would have foreseen); 57A Am.Jur.2d, Negligence, § 133 (2004) ("The phrasing of the standard of care in negligence cases in terms of the 'reasonable person' is firmly implanted in the American law of negligence").

*Id.* at 854, 172 P.3d at 1129 n.3. Focusing on this statement in *Steed*, the district court concluded that "Sections 6-1701 and 18-1501 create a duty to affirmatively act to protect children where a reasonable person would know the child is likely to be harmed." The district court further concluded that "whether the bridge jumping was a circumstance where a reasonable person should have known it was likely to result in injury" was a question of fact for the jury. Thus, it denied summary judgment as to the four Ward members who were present at the time of Heidi's injury.

The Beerses do not suggest that the Ward members willfully caused or permitted Heidi to suffer or that they inflicted unjustifiable physical pain or mental suffering on her. Rather, relying on the broad definition of "willfully," their theory is that the Ward members willfully caused or permitted Heidi to be injured or to be placed in such situation that her person or health was endangered. The difficulty for the Beerses is that the statute does not impose a duty upon the general public to act in such a way as to protect children from injury or exposure to dangerous conditions. Under the plain text of the statute, this duty only extends to those "having the care or custody of [the] child." As previously discussed, none of the Ward members had "the care or custody of" Heidi. Therefore, I.C. § 18-1501(2) imposed no duties and the district court erred by

16

denying their motion for summary judgment. For that reason, we reverse the district court's order denying their motion for summary judgment.

## IV. CONCLUSION

We affirm the district court's grant of summary judgment as to the Beerses' negligence claims against the COP and the Ward members. We reverse the district court's order denying the four Ward members' motion for summary judgment as to the child abuse claim and remand for proceedings consistent with this opinion. Costs to Respondents.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.