# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44053

| | | |
|---|---|---|
| TRAVIS FORBUSH and GRETCHEN HYMAS, individually and as the natural parents of PRIVATE FIRST CLASS MCQUEN C. FORBUSH, USMC (Deceased), and BREANNA HALOWELL,<br><br>    Plaintiffs-Appellants,<br>v.<br><br>SAGECREST MULTI FAMILY PROPERTY OWNERS' ASSOCIATION, INC., and JOHN KALSBEEK, individually and as President of the Sagecrest Multi Family Property Owners' Association,<br><br>    Defendants-Respondents,<br>and<br><br>JAY ARLA, individually and as vice president of the Sagecrest Multi Family Property Owners' Association; CHRIS SCHWAB, individually and as secretary of the Sagecrest Multi Family Property Owners' Association; DAVID MEISNER, individually and as treasurer of the Sagecrest Multi Family Property Owners' Association; FIRST RATE PROPERTY MANAGEMENT, INC., TONY DROST, individually and as president of First Rate Property Management, Inc.; SAGECREST DEVELOPMENT, LLC; PARK CITY PLUMBING, INC., nka PC PLUMBING, INC.; WIDGEON MECHANICAL, LLC nka IDAHO GEOTHERMAL, LLC; A.O. SMITH, INC.; MATTHEW E. SWITZER TRUST, and MATTHEW E. SWITZER, individually and as Trustee of the Matthew E. Switzer Trust; GOODMAN MANUFACTURING COMPANY, LP; ANFINSON PLUMBING, LLP; DANIEL BAKKEN, individually and as employee of Anfinson Plumbing, LLP; H&H PROPERTIES, LLC; and | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Boise, February 2017 Term<br><br>2017 Opinion No. 70<br><br>Filed:  June 20, 2017<br><br>Karel A. Lehrman, Clerk |

**INTERMOUNTAIN GAS COMPANY,** )
)
**Defendants.** )
)

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

District court order granting summary judgment, <u>affirmed</u> in part, <u>reversed</u> in part, and <u>remanded.</u>

Peterson Lawyers, Boise and The Spence Law Firm, Jackson, WY, for appellants. Michael F. Lutz argued.

Barnham, Howell & Gunn, PLLC, and Moore & Elia, LLP, Boise, for respondents. John Howell argued for respondent Kalsbeek and Michael J. Elia argued for respondent Sagecrest POA.

_____

BURDICK, Chief Justice.

Travis Forbush and Gretchen Hymas, individually and as natural parents of McQuen C. Forbush and Breanna Halowell (Appellants), appeal the Ada County District Court's grant of summary judgment to Sagecrest Multifamily Property Owners' Association, Inc., and its President, Jon Kalsbeek (Respondents). Forbush and Halowell were overnight guests of a tenant who leased a unit at the Sagecrest Apartment Complex (Sagecrest). During the night, hazardous levels of carbon monoxide filled the unit, killing Forbush and injuring Halowell. Appellants brought tort claims against Respondents after the incident. The district court granted summary judgment to Respondents. We affirm in part, reverse in part, and remand.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns an incident in which a vent on a water heater clogged and caused the emission of hazardous levels of carbon monoxide in unit 4624 at Sagecrest on November 10, 2012. The incident killed eighteen-year-old Private First-Class McQuen C. Forbush, a U.S. Marine; and injured eighteen-year-old Breanna Halowell. Forbush and Halowell were overnight guests of unit 4624's tenant Adra Kipper.

Sagecrest consists of forty-eight separate buildings, each containing four apartments. When Sagecrest was built, Sagecrest Development, LLC, recorded the Declarations of

2

Covenants, Conditions, and Restrictions (CCRs). The CCRs instruct that individuals or entities hold fee title to the separate buildings, each containing the four apartments. The CCRs grant these individuals or entities the "exclusive right" to maintain the interiors of the apartments they own. The unit owners are shareholders in the Sagecrest Multifamily Property Owners' Association (POA), a non-profit corporation. The CCRs task the POA with maintaining the exterior grounds at Sagecrest, including the sidewalks, landscaping, common areas, and fences. By contrast, the CCRs task unit owners with maintaining the "entire interior" of the units they own. To meet these maintenance duties, the CCRs require both the POA and unit owners to employ the same property management company. To that end, the POA and unit owners entered into maintenance contracts with First Rate Property Management (FRPM) in March 2010.

In spring 2011, carbon monoxide concerns emerged at Sagecrest. Evidently, some tenants had reported smelling gas inside of their units. Intermountain Gas was contacted about these concerns and explained the problem was due to certain water heaters' venting systems. Two types of water heaters were used at Sagecrest. Venting on one type had "a metal screen around the bottom of the tank." Venting on the second type "d[id]n't have a screen that goes around, but one in the middle on the bottom." Venting on the second type was prone to clogging, which, in turn, caused carbon monoxide to emit. After meeting with Intermountain Gas about the problem, FRPM surmised that "we just need to clean/vacuum off the screens and it will be fine."

Nonetheless, carbon monoxide concerns grew more serious that summer. In July 2011, Intermountain Gas was again contacted after another tenant reported smelling gas inside of her unit. Intermountain Gas described the carbon monoxide level as "deadly" and attributed it to the unit's water heater. That same month, a professional plumber, Ben Davis, inspected the water heaters at Sagecrest, identified the problematic venting system, and advised that "these issues be solved before any tenants suffer health problems or death." Thereafter, FRPM reasoned that more than just cleaning or vacuuming the screens was necessary, concluding "the only way to fix this problem without modifying the water heater is to replace them completely."

Although the POA knew of the carbon monoxide concerns, it did not move to modify or replace the water heaters. As the POA's President Jon Kalsbeek explained, "the water heaters are interior items of each unit" and, therefore, "an owners [sic] choice on how to handle this situation." Even so, the POA, primarily through Kalsbeek, became involved with the carbon monoxide issue in several ways. Although the CCRs give unit owners the "exclusive right" over

unit interiors, Tony Drost, FRPM's President, testified that the POA, through Kalsbeek, controlled "global issues" that were complex-wide, which included the water heaters. For example, the POA instructed FRPM to conduct carbon monoxide testing inside of the units every three months. To that end, the POA issued two sets of procedures governing carbon monoxide testing. Those procedures also governed the installation of hard-wired carbon monoxide alarms. And, in September 2011, the POA enlisted an engineering firm in an effort to explore solutions short of replacing the water heaters. According to the engineering firm, the various solutions were to (1) increase "fresh air intakes"; (2) replace existing water heaters; and (3) replace "the smoke detectors with CO/Smoke detector combination sensor[s.]"

In November 2011, FRPM relayed the engineering firm's findings to unit owners. Matthew Switzer, who owns the building in which unit 4624 sits, responded that he was unaware of any carbon monoxide issues with his units. FRPM clarified that Switzer's units had "checked in good during the CO detecting." FRPM further indicated that it would contact Switzer if later testing revealed carbon monoxide concerns with his units.

Under the POA's directive, FRPM conducted carbon monoxide testing on March 9, 2012. That testing revealed a high level of carbon monoxide in several units, including unit 4624. However, that testing was later contradicted. When Intermountain Gas tested unit 4624 on March 12, 2012, it reported normal, non-hazardous levels of carbon monoxide. In any event, although FRPM had stated it would contact Switzer if testing revealed carbon monoxide concerns with his units, Switzer was never contacted about the high levels discovered on March 9, 2012.

Warnings were distributed to tenants following the high levels of carbon monoxide discovered on March 9, 2012. The warning, placed on unit 4624's front door, informed tenant Adra Kipper that her unit's water heater was emitting "higher levels of carbon monoxide than we would like to see." The warning further informed Kipper that her water heater would be "replaced next week." A battery-powered carbon monoxide alarm was provided along with the warning because, although FRPM had begun to install hard-wired alarms under the POA's directive, a hard-wired alarm had not yet been installed in unit 4624.

Kipper's water heater was never replaced. And, although Kipper used the battery-powered carbon monoxide alarm initially, she eventually removed the alarm's batteries and placed it in a closet after it started beeping, apparently due to low batteries. Consequently, when Kipper had two overnight guests—Forbush and Halowell—staying over on November 10, 2012,

4

no alarm sounded when the vent on Kipper's water heater clogged and caused the emission of hazardous levels of carbon monoxide. The incident killed Forbush and injured Halowell.

Appellants filed their initial complaint on March 7, 2013, and eventually filed four amended complaints. They named several parties as defendants, including the POA and Kalsbeek, Respondents in this appeal. The district court granted summary judgment to Respondents. Appellants bring this timely appeal.

## II. ISSUES ON APPEAL

1. Did the district court properly grant summary judgment to the POA?
2. Did the district court properly grant summary judgment to Kalsbeek?
3. Should we award attorney fees on appeal?

## III. STANDARD OF REVIEW

> This Court reviews a summary judgment order under the same standard the district court used in ruling on the motion. *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 130 Idaho 323, 327, 940 P.2d 1142, 1146 (1997). That is, summary judgment is appropriate if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). We construe disputed facts in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Major v. Sec. Equip. Corp.*, 155 Idaho 199, 202, 307 P.3d 1225, 1228 (2013).

*Mitchell v. State*, 160 Idaho 81, 84, 369 P.3d 299, 302 (2016).

The main issues in this appeal trigger negligence, which consists of four elements: "(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Grabicki v. City of Lewiston*, 154 Idaho 686, 691, 302 P.3d 26, 31 (2013) (citation omitted). More specifically, this appeal centers on whether a duty existed, which is generally a question of law over which this Court has free review. *See Gagnon v. W. Bldg. Maint., Inc.*, 155 Idaho 112, 115, 306 P.3d 197, 200 (2013). However, whether a duty existed becomes a question of fact if it requires resolution of disputed facts. *See Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 402, 987 P.2d 300, 314 (1999).

5

# IV. ANALYSIS

The three main issues raised on appeal are whether (A) summary judgment was properly granted to the POA; (B) summary judgment was properly granted to Kalsbeek; and (C) Respondents are entitled to attorney fees on appeal. We discuss each below.

## A. Did the district court properly grant summary judgment to the POA?

Appellants contend the district court erred by granting summary judgment to the POA because triable issues of fact surround whether the POA (1) owed a premises liability-based duty of care; (2) owed a duty of care it acquired as a result of voluntary undertakings; and (3) is vicariously liable for FRPM's conduct.

### 1. Premises liability

Appellants first argue the POA owed a premises liability-based duty of care to Forbush and Halowell. As a threshold matter, we note that the POA neither owned nor occupied unit 4624. Instead, Switzer owns unit 4624, and tenant Adra Kipper occupied unit 4624. We must therefore decide whether a premises liability-based duty of care can be imposed on a party who neither owns nor occupies the property at issue.

Appellants correctly inform us that "the general rule of premises liability is that one having control of the premises may be liable for failure to keep the premises in repair." *Jones v. Starnes*, 150 Idaho 257, 261, 245 P.3d 1009, 1013 (2011) (quoting *Heath v. Honker's Mini-Mart, Inc.*, 134 Idaho 711, 713, 8 P.3d 1254, 1256 (Ct. App. 2000)). Appellants maintain that the POA had control over unit interiors under the CCRs and, regardless of the CCRs, actually exerted control over unit interiors. Consequently, Appellants assert it is irrelevant that the POA neither owned nor occupied unit 4624.

Appellants' position overlooks how our premises liability cases are limited to actions involving owners or occupiers of land and their agents. *E.g.*, *Rountree v. Boise Baseball, LLC*, 154 Idaho 167, 171, 296 P.3d 373, 377 (2013) ("The duty owed by *owners and possessors* of land depends on the status of the person injured on the land . . . ." (emphasis added)); *Stem v. Prouty*, 152 Idaho 590, 591–92, 272 P.3d 562, 563–64 (2012) (analyzing premises liability claim against owner of property); *Harrison v. Taylor*, 115 Idaho 588, 595, 768 P.2d 1321, 1328 (1989) ("Henceforward, owners and occupiers of land will be under a duty of ordinary care under the circumstances towards invitees who come upon their premises."). Thus, we reject Appellants'

6

premises liability argument and reaffirm our case law holding that a premises liability-based duty of care may be imposed only on owners or occupiers of land and their agents.

The dissent, however, maintains that status as an owner or occupier is irrelevant. The dissent's analysis wholly forgets that premises liability furnishes a fundamental tripartite framework, under which land entrants are defined as an invitee, a licensee, or a trespasser. *E.g.*, *Stiles v. Amundson*, 160 Idaho 530, 532 n.3, 376 P.3d 734, 736 n.3 (2016). The dissent's analysis renders the well-established tripartite framework inapplicable. A stranger who neither owns nor occupies the land at issue could not request an invitee to visit the land so as to confer a benefit on the land to the stranger, given that the stranger has no right to the land in the first place. Similarly, a stranger is without authority to authorize a licensee to enter land to which the stranger has no right. Finally, it cannot be said that a trespass occurs when a person enters land to which the stranger has no right simply because the stranger did not authorize that person's visit. Nevertheless, the dissent's analysis would permit these scenarios to be litigated under the rubric of "premises liability."

In the dissent's view, control is the essential test. While the dissent creates several hypothetical scenarios that are irrelevant to this case in an attempt to show that some degree of control, by itself, should be sufficient to trigger premises liability, this Court has never resolved a premises liability case in such a manner. Three of our cases firmly reinforce that premises liability does not extend beyond owners or occupiers of the premises and their agents, and that control determines which party, as between the owner or occupier and their agents, had control of the premises during the relevant time. First, in *Otts v. Brough*, 90 Idaho 124, 131, 409 P.2d 95, 98 (1965), *superseded on other grounds by* I.C. § 6-801, we explained:

> Owners or persons in charge of property owe to an invitee or business visitor the duty to keep the premises in a reasonably safe condition, or to warn the invitee of hidden or concealed dangers of which the owner or one in charge knows or should know by exercise of reasonable care, in order that the invitee be not unnecessarily or unreasonably exposed to danger.

*Otts* concerned the duty owed by a general contractor to a subcontractor. *Id.* at 131–32, 409 P.2d at 98–99. The general contractor occupied the worksite at issue, as he "stated that he was continually on the job site; that every day he supervised the entire work of the construction of the building[.]" *Id.* at 132, 409 P.2d at 99. We reversed summary judgment that had been granted to the general contractor, concluding triable issues of fact surrounded the general contractor's liability. *Id.* at 135–36, 409 P.2d at 101–02. *Otts*, therefore, forecloses the dissent's assertion that

7

our ruling today would allow "a general contractor or construction manager, who exercises the requisite control over the premises, [to] escap[e] liability . . . because he does not neatly fit within the categories elucidated today." As demonstrated in *Otts*, a general contractor or construction manager is regularly in occupation of the premises at issue. Additionally, the general contractor or construction manager is frequently an agent of the owner or occupier. But even supposing premises liability were for some reason inapplicable, the dissent embellishes the notion of a tortious general contractor or construction manager "escaping liability." Premises liability is not the exclusive path to liability.

Similarly, in *Jones*, as the dissent acknowledges, this Court stated that "the general rule of premises liability is that one having control of the premises may be liable for failure to keep the premises in repair." 150 Idaho at 261, 245 P.3d at 1013 (quoting *Heath v. Honker's Mini-Mart, Inc.*, 134 Idaho 711, 713, 8 P.3d 1254, 1256 (Ct. App. 2000)). Our clear holding in *Jones*, however, was that the district court properly found premises liability did not apply because the injury occurred "on a public sidewalk or street, and not on [the defendant's] property." *Id.*; *see also Heath*, 134 Idaho at 714, 8 P.3d at 1257 (affirming summary judgment for defendant because plaintiff's vague assertion that she "may well have been" on property the defendant owned did not raise a triable issue of fact). *Jones* illustrates that, if premises liability indeed applies, the issue becomes which party, as between an owner or occupier of the land and their agents, had control over the premises. We did not hold, nor even suggest, in *Jones* that a stranger who neither owns nor occupies the property can be sued in premises liability merely by exercising some degree of wrongful or rightful control over the property.

We reaffirmed these principles in our recent case of *Stiles v. Amundson*, 160 Idaho 530, 531, 376 P.3d 734, 735 (2016), which concerned a "premises liability action brought against . . . the owner of a piece of property[.]" In *Stiles*, the issue raised was "who, between a landlord and a tenant, owes the relevant duty of care to a tenant's social guests." *Id.* at 533, 376 P.3d at 737. In resolving that issue, we explained that "[e]xisting case law demonstrates it is the entity having control over the property that bears the burden of warning social guests and licensees of dangerous conditions on the property." *Id.* In affirming summary judgment for the property owner, we reasoned that:

> [T]enants are liable to injured third parties, including the tenant's social guests, as if they were the owner of the property. This stands to reason, because the tenant, as the possessor of the property, is in the best position to eliminate dangers or to

8

make those dangers known to third parties. Landlords, on the other hand, are not in a comparable position because they do not have possessory control over the land. Likewise, they do not have control over the guests hosted by the tenants, and they likely will not even be aware when a tenant's social guest is on the premises.

Further, landlords, who do not generally have unfettered access to the premises, cannot reasonably be expected to be aware of all potential hazards on the property while the tenancy is in effect, especially in the event that the tenant creates the hazard. It would create an unfair burden on landlords to give them a responsibility to warn social guests to whom they have no connection of dangers of which they have no way of learning.

*Id.* at 533–34, 376 P.3d at 737–38. Very similar to *Jones*, *Stiles* reinforces that, if premises liability applies, the issue becomes which party, as between an owner or occupier of the premises and their agents, had control over the premises during the relevant time.

Nevertheless, the dissent "cannot square the . . . decision today with the Court's recent decision in *McDevitt v. Sportsman's Warehouse, Inc.*, 151 Idaho 280, 255 P.3d 1166 (2011)." *McDevitt* involved a plaintiff who sued a tenant for injuries sustained on a sidewalk outside the tenant's retail store. *Id.* at 281, 255 P.3d at 1167. Specifically, the plaintiff tripped over a recessed sprinkler box on the sidewalk. *Id.* The landlord had hired Idaho Scapes, Inc. to install the sprinkler box. *Id.* at 282, 255 P.3d at 1168. At some point after Idaho Scapes installed the sprinkler box, it sunk about an inch below the sidewalk, and the plaintiff tripped on it. *Id.* When the case came before us on appeal, we affirmed that summary judgment was properly granted to the tenant because it owed no duty of care to keep the sidewalk, which was not part of the leased premises, reasonably safe or to warn of hazards. *Id.* at 281, 255 P.3d at 1167. As the dissent correctly observes, we first analyzed whether the tenant occupied the sidewalk, ultimately concluding the sidewalk "was not part of the leased premises." *Id.* at 285, 255 P.3d at 1171. We then addressed arguments concerning whether the tenant controlled the sidewalk outside its retail store. *Id.* Regarding that inquiry, we emphasized that "[n]o Idaho case has confronted a fact pattern such as the one at issue here, where the area over which the tenant allegedly has control is not a part of the leased premises." *Id.* In looking to other jurisdictions, we explained that, "absent a contractual obligation, a tenant in a multi-tenant shopping mall does not have control over common areas, and therefore has no duty to keep them safe for invitees." *Id.* (listing cases). We then concluded the tenant owed no duty of care to keep the sidewalk outside its retail store reasonably safe or to warn of hazards because the commercial lease and CCRs "imposed the duty to maintain the common areas on the landlord . . . ." *Id.* at 286, 255 P.3d at 1172. Accordingly,

9

*McDevitt* did not expand the confines of premises liability. Rather, we declined to hold that a tenant who neither owns nor occupies the area at issue can somehow exert the requisite control to trigger premises liability. Thus, *McDevitt* aligns with our analysis today. In fact, it is the dissent's analysis that *McDevitt* does not support. The dissent's analysis would suggest that Idaho Scapes, the entity that merely installed the sprinkler box, could be held liable in premises liability. That issue was never presented to us in *McDevitt*, and we never suggested that an entity like Idaho Scapes could be sued in premises liability. But once again, the dissent overlooks that, even if premises liability is for some reason inapplicable, it does not represent the exclusive path to liability in tort law.

The above holdings illustrate that premises liability concerns the duties owed by owners and occupiers of land and their agents. Secondary sources are in accord. *See, e.g.*, 2 *Premises Liability* 3d § 36:1 (2016) ("Premises liability stems from the law of negligence and constitutes the body of law that sets the guidelines *involving duties owed by an owner or occupier* of real estate . . . ." (emphasis added)); Restatement (Third) of Torts: Phys. & Emot. Harm § 51 (2012) (summarizing the duties that possessors of land owe). Thus, contrary to the dissent's assertion, our ruling in this regard is aptly supported by current law. Premises liability does not contemplate imposing a duty of care on a stranger who neither owns nor occupies the premises at issue merely because the stranger may have exercised some degree of wrongful or rightful control over the premises. Indeed, like we explained in *Stiles*, ascribing a premises liability-based duty to a party who is without "unfettered access" to the premises would create an unfair burden, as that party "cannot reasonably be expected to be aware of all potential hazards[.]"160 Idaho at 533–34, 376 P.3d at 737–38.

Declining to deviate from the above principles, we hold that a premises liability-based duty of care cannot be imposed on the POA since it neither owned nor occupied unit 4624.

2. Voluntary undertakings

The parties dispute (a) whether this argument is preserved; and (b) if so, whether it creates triable issues of fact.

(a) Is the voluntary undertakings argument preserved?

The POA argues Appellants did not preserve their voluntary undertakings argument for appeal because, although Appellants made voluntary undertakings arguments below, those arguments differ from what Appellants now assert on appeal. According to the POA, below

Appellants argued tenant Adra Kipper relied on the POA's alleged voluntary undertakings, but on appeal, Appellants argue FRPM—not Kipper—relied.

The POA's preservation argument is unavailing. Appellants made broad reliance arguments before the district court, stating that "[b]ecause the POA exerted absolute control over the property manager's operation and management at the property, First Rate did not even seek owner input on issues . . . the POA made the call." As a result, the district court reasoned that Appellants' arguments triggered the inquiry of whether the POA "undertook a duty and that Kipper, or *even some other party*, relied on [the] POA . . . ." That inquiry led the district court to conclude "no party presented any evidence that [the] POA represented to anyone, including First Rate, Switzer, or Kipper, that *it*, and *not* the owners, would provide and install carbon monoxide detectors or new water heaters." The district court further explained that FRPM did not rely on the POA's voluntary undertakings, if any, because FRPM understood that unit owners had exclusive control over unit interiors. Given that adverse ruling, Appellants' voluntary undertakings argument is preserved for this appeal.

(b)     Did the POA owe a duty of care as a result of voluntary undertakings?

This Court has recognized that if "one voluntarily undertakes to perform an act, having no prior duty to do so, the duty arises to perform the act in a non-negligent manner." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 400, 982 P.2d 300, 312 (1999). That duty, however, "is limited to the duty actually assumed." *Beers v. Corp. of Pres. of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 688, 316 P.3d 92, 100 (2013) (citation omitted). "[M]erely because a party acts once does not mean that party is forever duty-bound to act in a similar fashion." *Id.* This duty arises "when [i] one previously has undertaken to perform a primarily safety-related service; [ii] others are relying on the continued performance of the service; and [iii] it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking."[1] *Id.* (citation omitted). We discuss each element below.

---

[1] Although safety-related undertakings are frequently at issue, we note that any type of voluntary undertaking is sufficient. *Beers*, 155 Idaho at 688 n.5, 316 P.3d at 100 n.5 ("We do not intend to suggest that assumed duties exist only in the context of safety-related undertakings. To the contrary, the rule is that 'if one voluntarily undertakes to perform an act having no prior duty to do so' then a duty 'arises to perform the act in a non-negligent manner.' " (citation omitted)).

### i.    Specific undertakings

Appellants contend the POA specifically undertook to control (1) the installation of hard-wired carbon monoxide alarms; (2) preventative maintenance; and (3) carbon monoxide warnings.

### 1.    Hard-wired carbon monoxide alarms

Appellants argue triable issues of fact surround whether the POA voluntarily undertook to control the installation of hard-wired carbon monoxide alarms. That argument centers on how the POA, through Kalsbeek, issued two sets of procedures governing the installation of hard-wired carbon monoxide alarms.

The POA issued its first set of procedures in March 2012 after learning of carbon monoxide concerns. Under the POA's procedures, hard-wired carbon monoxide alarms were to be installed during "turnovers, preventative maintenance, lease renewals, or faulty smoke detectors . . . ." Thus, the procedures contemplated piecemeal installation. The procedures were amended after a tenant's carbon monoxide alarm sounded in October 2012. The tenant called the fire department, which tested the unit and found the water heater was emitting high levels of carbon monoxide. After that incident, FRPM contacted the POA to request immediate installation of hard-wired carbon monoxide alarms, seeking authorization for a maintenance man to visit "every unit and check and make sure the CO detectors that we installed are in working condition. The units that do not have CO detectors I would like him to install one." Kalsbeek responded on behalf of the POA, stating that he would talk "to the board and see how the board wants to proceed." FRPM's request for immediate installation was further discussed at the POA's annual meeting in October 2012, where it became clear that many units lacked hard-wired carbon monoxide alarms. After that meeting, the POA, through Kalsbeek, amended the procedures, stating that hard-wired carbon monoxide alarms were to be installed "continuously."

The POA argues it acted as nothing more than a "sounding board" for issues affecting multiple owners and, thus, did not exercise control over the installation of hard-wired carbon monoxide alarms. As an issue concerning unit interiors, the POA maintains that unit owners had exclusive control over the installation of hard-wired carbon monoxide alarms. On the one hand, in November 2011, FRPM sent an email to unit owners concerning hard-wired carbon monoxide alarms, seeking unit owners' approval for installation. Yet, eleven months later, Kalsbeek indicated that the POA's procedures governed, stating that "[t]here is absolutely nothing about

12

owners' . . . approval" with respect to the installation of hard-wired carbon monoxide alarms. The POA asserts that Kalsbeek merely meant that FRPM did not need unit owners' approval because FRPM already had authority to make repairs costing less than $250 under FRPM's maintenance contracts with unit owners, and hard-wired carbon monoxide alarms cost less than $250. While the record provides only indirect support for that assertion, its veracity is irrelevant. Even if that assertion is true, a jury could still reasonably find that the POA, through Kalsbeek, undertook to control the installation of hard-wired carbon monoxide alarms by issuing the two sets of procedures.

The district court concluded issuing the two sets of procedures was not an undertaking that would "create a duty to repair or replace the water heaters or to install carbon monoxide detectors inside the units." While the district court is correct that this undertaking would not create a "duty to repair or replace the water heaters or to install carbon monoxide detectors inside the units," that conclusion overlooks whether this undertaking would create a duty to nevertheless control the installation of hard-wired carbon monoxide alarms. We find triable issues of fact surround that issue.

2.          Preventative maintenance

The second voluntary undertaking Appellants cite concerns preventative maintenance and arises from a string of emails sent on April 15, 2011. That day, FRPM reported to the POA that certain maintenance needed to be performed, explaining that:

> Intermountain [G]as came out today and inspected an empty unit to try to find out what is causing the gas smell from the water heaters. He said the problem is with the venting. There are two different kinds of water heaters here, some have a metal screen around the bottom of the tank, the others don't have the screen that goes around, but one in the middle on the bottom. Those get clogged with lint, hair, debris very easily and if there is not adequate air flow from the bottom then the water heater cannot release exhaust. He said we just need to clean/vacuum off the screens and it will be fine. I think we should add this to the turn over spreadsheet under Typical Items for [the maintenance man] to vacuum out the bottom area and screens. Let me know if this is ok . . . .

Before the POA responded, another email from FRPM clarified that a professional plumber should be hired, explaining:

> No. Please do not have [the maintenance man] vacuum these. This is something the plumber needs to do. I already asked them when I went and had my "plumbing training" at their shop. In order to clean it properly some things have to be taken apart so it can get cleaned from both sides or it would be pointless

13

and/or could cause more problems. I will be in Meridian shortly and will explain. This will be a common problem since the units are located next to the dryers.

Later that day, the POA, through Kalsbeek, communicated disagreement with FRPM's idea that a plumber should be hired, citing cost concerns:

> This seems to be a very expensive solution to have a plumber come out and vacuum vents for water heaters. Why not have [the maintenance man] learn what needs to be done to do it correctly at a lower cost? Are these only going to be done at turnovers? The vents need to be cleaned at least annually for preventative maintenance to be effective, is this something that if regularly vacuumed will not require a labor intensive process? These could be done at the same time as the filter changes maybe?

Three days later, FRPM sent the POA information on the cost to hire a plumber and requested guidance as to what next steps should be taken. The POA, through Kalsbeek, responded that "[l]et us review this and get back to you next week." The POA never responded, and the maintenance was never performed. As a result, Appellants contend the POA undertook to control the above preventative maintenance and is to blame for the fact that it was not performed.

We note that the district court never addressed this undertaking, although it was raised below. On appeal, the POA argues Kalsbeek's "alleged non-response is not an affirmative act creating an assumption of duty to install detectors. Indeed, it was FRPM who was contractually obligated to have preventative maintenance performed on #4624 bi-annually at the expense of the owner . . . ." Although that argument boasts logical appeal, the undisputed facts do not support it. Instead, the above demonstrates that a jury could reasonably find that the POA voluntarily undertook to control preventative maintenance, regardless of any contractual obligations between FRPM and unit owners.

### 3. Carbon monoxide warnings

The third voluntary undertaking Appellants cite concerns carbon monoxide warnings. Appellants point to two warnings.[2] First, in July 2011, FRPM wanted to distribute a warning it had received from a professional plumber, Ben Davis, who inspected the water heaters after carbon monoxide concerns emerged. Davis's letter detailed the scope of the carbon monoxide threat and advised that "these issues be solved before any tenants suffer health problems or death." The POA, through Kalsbeek, intervened and instructed FRPM to not distribute Davis's

---

[2] We note that the warning tenant Adra Kipper received in March 2012, which stated that her unit's water heater was emitting "higher levels of carbon monoxide than we would like to see" and that her water heater would be "replaced next week," is not one of these warnings. No argument is made on appeal that the POA undertook any involvement with regard to that warning.

letter. Sheila Thomason, FRPM's maintenance supervisor, testified that Kalsbeek's instruction was the sole reason why Davis's letter was not distributed. As Thomason testified, Kalsbeek wanted to be "in charge of distributing this type of information to the individual – individual owners at Sagecrest."

Second, in March 2012, FRPM contacted Kalsbeek concerning warnings to distribute to unit owners and tenants and provided a draft warning. The warning "stated different levels of CO levels and what the . . . symptoms were experienced at those levels." Kalsbeek reviewed the warning and instructed FRPM to not distribute the warning, insisting it was irrelevant. FRPM, however, clarified that the warning had already been distributed.

The district court found that "no one presented any evidence that [the] POA undertook the duty to warn tenants about carbon monoxide issues . . . ." The POA similarly argues the above facts do not concern "acts to warn the tenants of the dangerous condition on the property previously . . . ." Neither the district court's finding nor the POA's argument persuades us. To be clear, the district court and the POA are correct insofar that the above facts do not show that the POA undertook to warn unit owners and tenants; rather, the above facts illustrate that FRPM undertook to warn unit owners and tenants. But that conclusion overlooks whether the POA undertook to exercise control over warnings by intervening, or attempting to intervene, with regard to the two warnings above. Exercising control over warnings is a different issue than actually distributing warnings, and we find triable issues of fact surround its resolution.

### ii.     Reliance

According to Appellants, FRPM relied on the POA with regard to the three voluntary undertakings explored above. The district court, by contrast, concluded no party relied on the POA and explained that:

> Other than argument, no party presented any evidence that Sagecrest POA represented to anyone, including First Rate, Switzer or Kipper, that _it_, and _not_ the owners, would provide and install carbon monoxide detectors or new water heaters. In fact, the only evidence is that Kipper did not even know who or what Sagecrest POA was. The only evidence in the record is that both Sagecrest POA and First Rate always recognized that First Rate needed Switzer's consent, as the owner of the unit, to repair or replace the water heaters if the cost was over $250.

The record before us on appeal causes us to disagree. First, as to the installation of hard-wired carbon monoxide alarms, the POA issued two sets of procedures governing that undertaking. The POA's procedures appear mandatory, as they instruct that the "procedures shall

15

be followed . . . ." FRPM referred to the POA's procedures as "Jon's procedures or Jon's way." Specifically, "[h]e came into town . . . and said, '[t]his is what the procedures are going to be.' He laid them out for [FRPM]." And, the POA refused to deviate from those procedures. For instance, although FRPM requested to make immediate installation of hard-wired carbon monoxide alarms in October 2012, the request was never granted. Indeed, Lizz Loop, FRPM's general manager, explained that immediate installation was not performed because FRPM was "following the procedures." Thus, triable issues of fact surround whether FRPM relied on the POA with respect to this voluntary undertaking.

Triable issues of fact also surround whether FRPM relied on the POA with respect to preventative maintenance. As discussed, FRPM proposed hiring a plumber to perform preventative maintenance, provided information on the cost to do so, and requested guidance. The POA, through Kalsbeek, objected to FRPM's proposal, citing cost concerns, but indicated the POA would nevertheless review that information and "get back . . . next week." But the POA never did so, and the preventative maintenance was never performed. Given that the POA represented it would provide guidance, a jury could reasonably find that FRPM relied on the POA regarding this voluntary undertaking.

Finally, triable issues of fact surround whether FRPM relied on the POA with respect to the distribution of Ben Davis's letter. As noted, FRPM sought to distribute Davis's letter in July 2011. Because Kalsbeek's instruction prohibited FRPM from doing so, as Thomason testified, a jury could reasonably find that FRPM relied on the POA with respect to the distribution of Davis's letter. Conversely, reliance cannot be shown as a matter of law regarding the warning issued in March 2012. The key undisputed fact undermining reliance is that the March 2012 warning was issued before the POA, through Kalsbeek, could intervene. While Kalsbeek instructed that the warning should not be issued, his instruction came too late. In sum, although reliance fails as a matter of law regarding the March 2012 warning, triable issues of fact surround whether FRPM relied on the POA with respect to Davis's letter.

The POA tries to rebut the above by arguing FRPM could not rely on the POA with respect to undertakings FRPM had contracted to perform on behalf of unit owners. The undisputed facts do not support that argument. Based on the above, the record is replete with factual disputes showing that a jury could reasonably find that FRPM relied on the POA. In fact, this case is similar to *Baccus v. Ameripride Services, Inc.*, 145 Idaho 346, 179 P.3d 309 (2008).

16

In *Baccus*, an employer hired a contractor to place safety mats at workplace entryways. *Id.* at 351–52, 179 P.3d at 314–15. On at least one occasion, the contractor failed to do so, and as a result, an employee slipped and became injured. *Id.* The employee sued the contractor in negligence. *Id.* When the case came before us on appeal, we explained with regard to reliance: "[s]o, [the contractor] induced [the employer's] reliance on [the contractor's] promise to replace the safety mats, which increased the risk that . . . [an] employee such as plaintiff could slip, fall, and sustain injury were the promise not kept." *Id.* at 352, 179 P.3d at 315. Here, like *Baccus*, a jury could reasonably find that the POA induced FRPM's reliance with regard to hard-wired carbon monoxide alarms, preventative maintenance, and carbon monoxide warnings, all of which were matters with the potential to increase the risk of harm to Sagecrest tenants and guests. Therefore, we conclude triable issues of fact surround reliance.

### iii. Foreseeability

"[N]ormally, the foreseeability of a risk of harm, and thus whether a duty consequently attaches, is a question of fact reserved for the jury." *Stoddart v. Pocatello Sch. Dist. #25*, 149 Idaho 679, 686, 239 P.3d 784, 791 (2010). We find that to be true in this case. We cannot say as a matter of law that Forbush's death and Halowell's injuries were or were not foreseeable. Instead, we find it proper for a jury to decide.

In sum, triable issues of fact surround whether the POA acquired a duty of care as a result of the voluntary undertakings explored above. We therefore reverse the district court's grant of summary judgment in this regard and remand for further proceedings consistent with this opinion. We emphasize that if the POA is found to have acquired a duty of care as a result of these voluntary undertakings, any duty imposed must be limited to the scope of the actual undertaking. *Cf. Beers v. Corp. of Pres. of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 688, 316 P.3d 92, 100 (2013) ("[A]lthough a party may assume a duty by undertaking to act, that duty is limited to the scope of the undertaking.").

### 3. Vicarious liability

Finally, Appellants argue triable issues of fact surround whether the POA is vicariously liable for the torts of its agent, FRPM. "A principal is liable for the torts of an agent committed within the scope of the agency relationship." *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 303, 796 P.2d 506, 512 (1990). An agency relationship arises when the principal:

17

(1) [E]xpressly grants the agent authority to conduct certain actions on his or her behalf; (2) impliedly grants the agent authority to conduct certain actions which are necessary to complete those actions that were expressly authorized; or (3) apparently grants the agent authority to act through conduct towards a third party indicating that express or implied authority has been granted.

*Humphries v. Becker*, 159 Idaho 728, 735, 366 P.3d 1088, 1095 (2016). "This Court has previously viewed the question of whether an agency relationship exists as a question of fact for the jury to determine." *Id.* at 735 n.2, 366 P.3d at 1095 n.2. But, to be clear, "[w]hether facts sufficient to constitute an agency relationship exist is indeed a question of fact for the jury, however, whether a given set of facts are sufficient to constitute an agency relationship is a question of law appropriate for this Court's consideration." *Id.*

The district court rejected Appellants' agency argument, concluding Appellants lacked authority over unit interiors. That conclusion rests on the authority granted to the POA under the CCRs, which the district court found was limited to unit exteriors. We agree insofar that the CCRs do not grant the POA any authority over unit interiors, and hence, the CCRs cannot give rise to an agency relationship over unit interiors. Indeed, the CCRs clearly and unambiguously delineate authority between the POA and unit owners. CCR § 3.3 gives the POA authority over unit exteriors and unit owners authority over unit interiors. CCR § 3.5 reinforces that delineation of authority, as it provides that "[e]ach Owner shall have the *exclusive right* to paint, repair, tile, wash, paper or otherwise maintain . . . the interior portions of their Four Plex . . . ." Because the CCRs do not give the POA any authority over unit interiors, they cannot give rise to an agency relationship over unit interiors.[3]

---

[3] The parties dispute the extent of authority granted to the POA under CCR § 3.8, which provides:

> In the event the Owner of any Residential Lot improved with a Four Plex shall fail to maintain any portion of such Owner's Residential Lot that Owner is responsible to maintain, in a manner reasonable satisfactory to the Board, after approval by vote of at least sixty percent (60%) of the members of the Board present and voting and subject to such Owner's right to notice and a hearing before the Board, the Association may, through its agents and employees, enter upon the Residential Lot or Four Plex and repair, maintain and restore the Residential Lot, or the Four Plex. The cost of such repair, maintenance and restoration shall be chargeable to the Owner of such Residential Lot or Four Plex and shall constitute a lien on the Residential Lot of such Owner, collectible in the same manner as Limited Assessments under this Declaration.

The parties specifically dispute whether CCR § 3.8 extends to unit interiors and thus whether it gives the POA authority to maintain unit interiors if unit owners fail to do so. We do not address that dispute. What is undisputed is that CCR § 3.8 requires a 60% vote, notice, and hearing before the POA can take any action. And what is further undisputed is that the procedure did not occur in this case. As a result, the authority CCR § 3.8 provides to the POA, whatever its extent, was never triggered.

However, the district court overlooked how authority bestowed by a contract, like the CCRs, is not dispositive when determining whether an agency relationship exists. *E.g.*, *Thornton v. Ford Motor Co.*, 297 P.3d 413, 419 (Okla. Civ. App. 2012) ("If the facts show actual control by the principal, an agency is established regardless of the contract language."); *Hylton v. Koontz*, 532 S.E.2d 252, 257 (N.C. Ct. App. 2000) ("It is not dispositive that a contract denies the existence of an agency relationship, if in fact the relationship was that of agent-principal."); *Tomlinson v. G.E. Capital Dealer Distrib. Fin., Inc.*, 624 So. 2d 565, 567 (Ala. 1993) ("[T]he language of this provision is not conclusive and will not preclude the finding of agency if there is independent evidence of a retained right of control."). We have long instructed that the "important factor is the control or right of control reserved by the [principal] over the functions and duties of the agent." *Koch v. Elkins*, 71 Idaho 50, 57, 225 P.2d 457, 462 (1950).

In this case, we find triable issues of fact surround whether an agency relationship existed as a result of control the POA actually exerted over FRPM with regard to unit interiors. As a general matter, the record shows that the POA exercised financial leverage over FRPM. As Appellants assert, Sagecrest was FRPM's largest account, and FRPM was therefore required to stay in the POA's "good graces" to keep Sagecrest. CCR § 6.6A supports that assertion, as it required unit owners to employ the same property management company the POA selected to employ for its duties. Further, the POA controlled FRPM's rate of compensation. FRPM's compensation at Sagecrest was twofold: (1) a $150 monthly management fee, paid by the POA; and (2) five percent of monthly gross rental receipts, which, although paid by unit owners, was contingent on the rental rates that the POA and FRPM set. Finally, the POA paid the wages of FRPM's employees who were "fully assigned" to Sagecrest. The POA therefore oversaw those employees' overtime requests. For example, in October 2012, the POA requested FRPM to clarify in which units hard-wired carbon monoxide alarms were installed. In response, FRPM's employee requested to stay late, working overtime, to gather the information. The POA denied the overtime request.

The POA maintains that the above arguments are "completely irrelevant to the issues of control of the interiors of the units." The POA elaborates that "Switzer had a contract with FRPM to manage his unit #4624. Switzer granted authority to FRPM over his residential lot and, as a non-party to the contract, the SMPOA Board could not alter this agreement in any way." We decline to find Switzer's contract with FRPM dispositive. Despite that contract, we find triable

issues of fact surround whether the above leverage allowed the POA to exert control over FRPM and unit interiors. Tony Drost, FRPM's President, testified that the POA, through Kalsbeek, controlled "global issues" that were complex-wide. Drost testified that global issues extended to unit interiors and consisted of "the CO testing"; "the water heaters"; "leaks with the windows, stairwells, light bulbs." According to Drost, FRPM was required to "run any global issue through [Kalsbeek] . . . ." Sheila Thomason, FRPM's Maintenance Supervisor, further testified that Kalsbeek "was in charge." She explained that Kalsbeek led FRPM to believe that "he spoke on behalf of the owners." Thus, Switzer's contract with FRPM does not resolve whether the POA exerted actual control over FRPM and unit interiors.

Moreover, as explained above, triable issues of fact surround whether FRPM relied on the POA regarding (1) the installation of hard-wired carbon monoxide alarms; (2) preventative maintenance; and (3) carbon monoxide warnings. *See supra* Part IV(A)(2)(b). Based on the record before us on appeal, triable issues of fact surround whether the POA's control over FRPM caused FRPM to rely on the POA with respect to those voluntary undertakings. Consequently, we cannot say as a matter of law that no agency relationship existed as a result of actual control. We therefore reverse summary judgment on this issue and remand for further proceedings consistent with this opinion.

**B.     Did the district court properly grant summary judgment to Kalsbeek?**

Appellants contend triable issues of fact surround whether Kalsbeek owed a duty of care he acquired as a result of voluntary undertakings.[4] To make this argument, Appellants rely on the same contentions explored above concerning the POA. *See supra* Part IV(A)(2)(b). Here, however, Appellants' arguments implicate Kalsbeek as an individual, not as the POA's President. Thus, Appellants seek to hold Kalsbeek personally liable.

"A director who personally participates in a tort is personally liable to the victim, even though the corporation might also be vicariously liable." *Eliopulos v. Knox*, 123 Idaho 400, 404, 848 P.2d 984, 988 (Ct. App. 1992). The same is true for corporate officers. *See, e.g.*, 18B Am. Jur. 2d *Corporations* § 1609 (2016) ("A director or officer of a corporation does not incur personal liability for its torts . . . unless he or she has participated in the wrong, had direct

---

[4] In their opening brief, Appellants argued Kalsbeek also owed a premises liability-based duty of care. Appellants have withdrawn that argument. Additionally, although Kalsbeek discussed vicarious liability in his brief, Appellants make clear that they seek to hold only the POA vicariously liable. Thus, we are left with only the voluntary undertakings argument.

personal involvement . . . or authorized or directed that the wrong be done."). "A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his or her representative character even though the corporation might be insolvent or irresponsible." *Id.*

In granting summary judgment to Kalsbeek, the district court applied the same logic to Kalsbeek as it applied to the POA and concluded Kalsbeek did not acquire a duty of care as a result of voluntary undertakings. That conclusion represents error. Based on the above, triable issues of fact surround whether the POA acquired a duty of care as a result of voluntary undertakings. And, as noted, Kalsbeek directed those undertakings. Kalsbeek promulgated the POA's two sets of procedures governing the installation of hard-wired carbon monoxide alarms. FRPM even referred to those procedures as "Jon's procedures." Kalsbeek objected to FRPM's preventative maintenance proposal and instructed FRPM that the POA would provide guidance, but he failed to do so. Kalsbeek intervened in an effort to control the warnings issued to unit owners and tenants, and as FRPM explained, Kalsbeek was the sole reason why Ben Davis's letter was not distributed.

Kalsbeek concedes his involvement in these matters, but he contends it does not give rise to a duty of care. He emphasizes how CCR § 7.2 designates him as the "the authorized representative of the [POA] to give and receive notices, approvals, and instructions hereunder." Simply that the CCRs may authorize Kalsbeek's involvement is irrelevant. Even if his involvement were authorized, that authorization would not resolve whether he acquired a duty of care as a result of voluntary undertakings and could therefore be subject to personal liability if he personally participated in tortious conduct.

Thus, we conclude triable issues of fact surround whether Kalsbeek acquired a duty of care for the same reasons identified above. *See supra* Part IV(A)(2)(b). We therefore reverse summary judgment granted to Kalsbeek.[5]

## C.    Should we award attorney fees on appeal?

Appellants do not request fees. Kalsbeek and the POA request fees under Idaho Code section 12-121, Idaho Rule of Civil Procedure 54(e)(1), and Idaho Appellate Rule 41. Fees are

---

[5] Even if he acquired a duty of care, Kalsbeek argues he is immune from liability under Idaho Code section 30-30-623. Yet, since Kalsbeek concedes the district court did not address the issue of immunity, we decline to reach it on appeal. *Cf. Boise Tower Assocs., LLC v. Hogland*, 147 Idaho 774, 784, 215 P.3d 494, 504 (2009) (remanding case for resolution of issues the district court never reached).

properly awarded to the prevailing party "if the action was pursued, defended, or brought frivolously, unreasonably, or without foundation." *Idaho Military Historical Soc'y, Inc. v. Maslen*, 156 Idaho 624, 633, 329 P.3d 1072, 1081 (2014) (citation and internal quotation marks omitted).

As to Kalsbeek, he is not the prevailing party on appeal and is therefore not entitled to fees. As to the POA, it prevails on appeal on the premises liability issue, but Appellants prevail on the issues of whether the POA may have acquired a duty of care as a result of voluntary undertakings, and whether the POA may be vicariously liable for FRPM's conduct. Although the POA is the prevailing party on the premises liability issue, Appellants did not bring or pursue that argument frivolously, unreasonably, or without foundation. Accordingly, we do not award fees on appeal.

## V. CONCLUSION

We affirm in part and reverse in part the district court's summary judgment order. We affirm that summary judgment was properly granted as to whether the POA owed a premises liability-based duty of care. However, summary judgment was improperly granted as to whether the POA and Kalsbeek acquired a duty of care as a result of voluntary undertakings, and whether the POA is vicariously liable for FRPM's conduct. We therefore remand this case for further proceedings consistent with this opinion. We decline to award attorney fees on appeal. We award Appellants costs against Kalsbeek on appeal because they prevail against him, but not against the POA.

Justices, EISMANN, JONES and HORTON **CONCUR.**

BRODY, Justice, concurring in part, dissenting in part.

I respectfully dissent from Part IV.A.1. of the Court's opinion, because I disagree with the majority's conclusion that premises liability can only be imposed on an "owner" or "occupier" of land or their agents. This bright-line rule is inconsistent with our prior case law and may allow some responsible parties to escape liability.

The majority begins its analysis with the statement "[a]ppellants correctly inform us that 'the general rule of premises liability is that one having *control* of the premises may be liable for failure to keep the premises in repair.' *Jones v. Starnes*, 150 Idaho 257, 261, 245 P.3d 1009, 1013 (2011) (quoting *Heath v. Honker's Mini-Mart, Inc.*, 134 Idaho 711, 713, 8 P.3d 1254, 1256 (Ct.App. 2000))." The majority then limits this principle by stating that our case law

22

demonstrates that premises liability is limited to owners or occupiers or their agents. The majority contends that the issue of control only comes into play when there is a dispute between owners and occupiers as to whom actually owes a duty to the injured party. I disagree with the majority's analysis.

To begin with, none of the cases cited by the majority actually address whether someone other than an owner or occupier or their agents can be held responsible under a premises liability theory. The first case the majority cites is *Rountree v. Boise Baseball, LLC*, 154 Idaho 167, 296 P.3d 373 (2013). In *Rountree,* the plaintiff was a patron at a Boise Hawks baseball game. *Id.* at 169, 296 P.3d at 375. He was seated in the executive section of the stadium when he was hit in the face with a baseball during the game. *Id.* He lost an eye. *Id.* He sued a number of parties, including the baseball team and the owner of the stadium. *Id. Rountree* contains this statement: "[t]he duty owed by owners and possessors of land depends on the status of the person injured on the land . . . ." *Id.* at 171, 296 P.3d at 377. The majority quotes this language, but it is important to recognize that *Rountree* does not actually address whether someone other an owner or possessor of land can be held responsible under a premises liability theory. The issues actually decided in *Rountree* were whether Idaho should adopt the so-called "baseball rule" (a rule which limits owner liability to protect against foul balls) and whether the patron assumed the risk of being hit. *Id.* at 170–75, 296 P.3d at 376–81.

The majority also cites *Stem v. Prouty*, 152 Idaho 590, 272 P.3d 562 (2012). *Stem* involved a forklift accident. *Id.* at 591, 272 P.3d at 563. The plaintiff lost his leg after being pinned underneath a forklift that toppled over when it broke through a water meter cover in the floor. *Id.* The plaintiff sued the landowner, alleging that the premises were unsafe because the water meter cover was too thin to support the weight of the forklift. *Id.* The only issue decided by the Court was whether the landowner was not responsible because there was no evidence that he knew that the water meter cover created a dangerous condition. *Id.* at 593–94, 272 P.3d at 565–66. The *Stem* decision does not address whether a premises liability can be brought against a tortfeasor who is not a landowner or occupier.

The final case cited by the majority is *Harrison v. Taylor*, 115 Idaho 588, 768 P.2d 1321 (1989). The plaintiff in *Harrison* brought suit against a building owner and tenant when she fell in a hole in a sidewalk in front of the business. *Id.* at 589–90, 768 P.2d at 1322–23. The trial court granted summary judgment in favor of the defendants based on the "open and obvious"

doctrine. *Id.* at 590, 768 P.2d at 1323. This Court reversed, finding that the doctrine was inconsistent with Idaho's comparative negligence laws. *Id.* at 595–96, 768 P.2d at 1328–29. Like *Stem* and *Prouty*, the *Harrison* decision did not address in any fashion whether a premises liability action could be brought against someone other than an owner or occupier or their agents.

The earliest case where the Court addressed premises liability in the context of a non-owner appears to be *Otts v. Brough*, 90 Idaho 124, 409 P.2d 95 (1965), *superseded on other grounds* by I.C. § 6-801. In *Otts*, the plaintiff was injured when he fell into a framed opening in a concrete floor. *Id.* at 128–29, 409 P.2d at 96–97. The plaintiff was a subcontractor who had been hired to do the ceiling insulation in a new school building that was being constructed in Rexburg. *Id.* The plaintiff sued the general contractor for failing to guard and warn against the danger created by the opening in the floor. *Id.* at 129, 409 P.2d at 97. The trial court granted summary judgment in favor of the general contractor, holding that the claim was barred by the defense of assumption of risk. *Id.* This Court reversed, holding that there were genuine issues of material fact which precluded summary judgment. *Id.* at 134–36, 409 P.2d at 100–02. In addressing the duty owed by the general contractor, the Court held: "Owners or *persons in charge of property* owe to an invitee or business visitor the duty to keep the premises in a reasonably safe condition, or to warn the invitee of hidden or concealed dangers of which the owner or one in charge knows or should know by exercise of reasonable care, in order that the invitee be not unnecessarily or unreasonably exposed to danger." *Id.* at 131, 409 P.2d at 98 (emphasis added).

The majority contends that *Otts* can be squared with their holding today because there is evidence that the general contractor "occupied" the worksite. While I agree that there is evidence in *Otts* from which a reasonable jury could reach that conclusion, the "persons in charge of property" language in *Otts* is a better test for determining whether premises liability should attach than the "occupier" label used by the majority. A simple example illustrates my point.

Suppose I hire a contractor to remodel my kitchen. The contractor works at my house a few days a week while my family and I are still living in the home. One day, my mother comes to visit. She is helping me cook dinner. She steps inside the pantry to get an ingredient and is injured when she falls into a hole in the floor. I had no idea the hole was there and there was no warning or barricade. Can the contractor be held responsible for her injuries under a premises liability theory for creating a dangerous condition on the premises? Under the majority's decision today the answer would likely be no since the contractor does not "occupy" the house.

24

My family and I do. If the analysis were "does the contractor control the premises" -- as I advocate the legal test is in Idaho -- the answer would much more likely be yes. Imposing premises liability on a contractor in a situation like this makes sense because he created the hazard and was in a position to remedy it or guard against it.

The majority's decision to include "agents" within the categories of persons who can be held liable under a premises liability theory, while a step in the right direction, does not go far enough to address my concerns. Another example illustrates my point.

Suppose a local school district hires a general contractor to build a new science wing at its high school. The general contractor enters into a contract with a construction manager to oversee the project. A student is injured when he falls into a hole that has been covered with a flimsy piece of plywood. Can the general contractor and/or the professional construction manager be held responsible under a premises liability theory as "agents" of the school district? The majority says yes, asserting that general contractors and professional construction managers are "frequently" the agents of the landowner. My experience tells me differently.

This Court explained nearly 100 years ago that "[a]gency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf *and subject to his control*, and consent by the other so to act." *Gorton v. Doty*, 57 Idaho 792, 798, 69 P.2d 136, 139 (1937) (emphasis added). When a school district hires a general contractor to build a new science wing, it usually does so because the district does not have the knowledge, skills, tools, or time to do the work. The general contractor is an *independent contractor* who exercises its own judgment about how to do the work and provides the tools and skills to get it done. There is a contractual relationship between the district and the general contractor, but that contractual relationship does not necessarily mean there is an *agency* relationship.

Similarly, the construction manager in my example cannot be the school district's agent. The school district did not even contract with the construction manager so there is no consent by either party and the school district would have no control over anything the construction manager does. The general contractor might control the construction manager depending on the contractual relationship, but a professional construction manager may also be an independent contractor. While I would agree that it is the landowner who typically contracts with a construction manager and that an agency relationship is more likely to exist in that scenario, construction projects are carried out in many different ways and one cannot assume that a

25

construction manager will always be the landowner's agent. Given the complex nature of modern business entities and real estate transactions, it is possible to imagine the prospect of a general contractor or construction manager, who exercises the requisite control over the premises, escaping liability under the majority's rule because he does not neatly fit within the categories elucidated today.

Other jurisdictions have dealt with this issue and have concluded that construction contractors share in premises liability, even though they are neither owner nor occupier. *See Worth v. Eugene Gentile Builders*, 697 So.2d 945 (Fla. Dist. Ct. App. 1997) (holding that contractors may share premises liability for job site injuries when the premises are under the contractor's control); *see also* 62 AM. JUR. 2D *Premises Liability* § 6 (2005); 13 AM. JUR. 2D *Building and Construction Contracts* § 136 (2009); 4r § 384. In Maine, premises liability for other parties has arisen in the context of whether a national fraternity is liable for sexual assault perpetrated by one of its members. In *Brown v. Delta Tau Delta*, 2015 ME 75, 118 A.3d 789 (2015), the Supreme Judicial Court concluded that the national fraternity organization had a premises-liability-based duty to its collegiate chapters' social invitees, even though the national fraternity did not own or occupy the premises in question, because the assault was forseeable, the national fraternity had authority to control its members and actually exercised that control, and because it had a sufficiently close relationship with its local chapters and individual members.

I cannot square the majority's decision today with the Court's recent decision in *McDevitt v. Sportsman's Warehouse, Inc.*, 151 Idaho 280, 255 P.3d 1166 (2011). In *McDevitt*, the plaintiff was injured when she slipped or tripped over a recessed irrigation box in a sidewalk outside of Sportsman's Warehouse in Twin Falls. *Id.* at 281, 255 P.3d at 1167. The primary issue presented in the case was whether Sportsman's could be held liable under a premises liability theory for the alleged dangerous condition. *Id.* at 283, 255 P.3d at 1169. In answering this question, this Court engaged in a two-step analysis. *Id.* at 284–86, 255 P.3d at 1170–73. First, it explained that a tenant "occupies" land. *Id.* This Court then analyzed whether the sidewalk was part of Sportsman's leased premises and determined that it was not. *Id.* This Court's analysis did not, however, stop there. Even though the Court concluded that Sportsman's was not an "occupier" of the sidewalk (i.e., it did not fit within one of the categories of persons defined by the majority today), this Court then went on to analyze whether Sportsman's *controlled* the sidewalk. *Id.* at 285–86, 255 P.3d at 1171–72. While the plaintiff in *McDevitt* was ultimately

unsuccessful in demonstrating Sportsman's control, all I am saying is that the majority should have applied the same legal analysis to this case.

In this case, the record contains evidence that the POA exercised some control over the interior of the apartment units, regardless of the content of the CC&R's.  FRPM's President testified that POA handled "global issues" that affected apartment units complex wide, such as furnace filters and water heaters. These global issues were not restricted to the exterior of the units, as the CC&R's seemed to contemplate. For instance, the POA ordered the FRPM to conduct carbon monoxide testing inside each unit every three months. They also issued two sets of procedures for handling carbon monoxide issues related to the faulty water heaters, including directing the installation of hard-wired carbon monoxide alarms inside the units. From my perspective, this evidence is sufficient to create a genuine issue of material fact about whether the POA exercised sufficient control to incur premises liability. For that reason I believe that summary judgment on this issue was not proper. The issue should have been submitted to a jury.